THE UNITED STATES, APPELLANTS, *v.* JEAN BAPTISTE D'AUTERIVE AND OTHERS, HEIRS AND REPRESENTATIVES OF THE LATE JEAN ANTOINE BERNARD D'AUTERIVE.

Following out the principles applied to the construction of treaties in the cases of United States *v.* Reynes, and Davis *v.* The Police Jury of Concordia, in 8 Howard, this court now decides that a grant of land in Louisiana, issued by the representative of the king of France in 1765, was void; the Province of Louisiana having been ceded by the king of France to the king of Spain in 1762.

The title to the land described in this void grant was vested, therefore, in the king of Spain, and remained in him until the treaty of St. Ildefonso. It then passed to France, and by the treaty of Paris became vested in the United States.

None of the acts of Congress have confirmed this grant.

The act of 1805 (2 Stat. at Large, 324) required three things in order to effect a con-

firmation. 1st. That the parties should be residents. 2d. That the Indian title should have been extinguished. 3d. That the land should have been actually inhabited and cultivated by the grantees, or for their use. In the present case these conditions were not complied with.

The act of May 26, 1824, in part reenacted by the act of June 17, 1844 (5 Stat. at Large, 676), did not create any new rights, or enlarge those previously existing; but only allowed claims to be presented to the court which would otherwise have been barred.

This was an appeal from the District Court of the United States for the District of Louisiana.

It was a petition presented to the District Court under the act of 1824, relating to land titles in Missouri, as revived and made applicable to Louisiana by the act of 1844.

The history of the title claimed by the heirs of D'Auterive, so far as it may be necessary to explain the opinion of the court, was as follows.

A copy of the following grant, issued in 1765, was certified by the register of the land-office at New Orleans to be found upon the records in his possession, and forming part of the archives of the office.

" Charles Philippe Aubry, Chevalier of the Royal and Military Order of St. Louis, commanding for the King in Louisiana, and Denis Nicholas Foucault, being the Intendant Commissary of this Province of Louisiana.

" Upon the demand made by Messrs. D'Auterive and Masse, partners, to grant to them a parcel of land named La Prairie du Vermilion, bounded east by the River Des Tortues and the Lake Du Tasse, north by the Mauvais Bois, west by the River Vermilion, and south by a muddy prairie, considering their petition above, and in other part, and for consideration of the cession made by them to the Acadian families, recently arrived in this Province, of the land occupied by them during a long period, in the Attakapas, and in consideration also of the advantages which may result for this capital of the great establishment in vacheries that they propose themselves to do on the said land named La Prairie du Vermilion, by the quantity of cattle they may bring to market in a short period, we have conceded, and do concede, to them, by these presents, the said land, for them and their heirs, to enjoy and dispose of the same in full ownership and usufruct, as a thing belonging to them, except against titles or possession anterior to these to the contrary; provided that said land lies on this side of the limits which have been established of the French and Spanish possessions in this part of the country; and provided, also, that they do deliver to us the titles of the land which they have ceded to the Acadian families, and also under the conditions

that one year from this date they shall establish the said vacherie ; in default whereof the said land shall become part of the king's domain, who may dispose of the same as if the said concession had never been granted, and also with the burden by them to support and pay the seigneurial rights, if any hereafter be established in this colony. We also reserve for his Majesty all the timber necessary for the construction of forts, stores, and other public works that he has ordered. to be done, or may order in the future, even for the refitting and careening of his men-of-war, whenever the same will be necessary ; and also the necessary ground for the royal highways and fortifications.

" Given in New Orleans, under the seals of our arms and the countersign of our secretaries, the 2d of March, 1765.
(Signed,)	AUBRY AND FOUCAULT.
" Countersigned, — SOUBIE & DUVERGE."

The decision of the court being that this grant was invalid when made, it is not necessary to trace out the assignment of his share from Masse to D'Auterive, by which it was alleged that the latter became the sole proprietor.

On the 6th of February, 1835, Congress passed an act (4 Stat. at Large, 749), entitled " An Act for the final adjustment of claims to lands in the State of Louisiana."

By this act, claims recognized by former laws as valid, but which had not been confirmed, were to be presented to the register and receiver of the land-office where the lands lie, with the evidence in support of the same, who were to report the same to the Secretary of the Treasury, with their opinion of the validity of each claim, and which report was to be laid before Congress, with the opinion of the Commissioner of the General Land-Office touching the validity of the respective claims.

This claim was presented to the register and receiver, together with a great mass of evidence in its support, which it is not necessary here to state. On account of the voluminous nature of the papers, the claim was not included in a report made by the commissioner on the 15th of May, 1840. But in February, 1842, the then register and receiver took up the subject, and made a report thereon to the Secretary of the Treasury, from which the following is an extract : —

" The peculiar circumstances which seem to involve this claim, its unwarrantable neglect, firstly by the heirs themselves, and lastly by the former boards of this office, and the unsuccessful efforts of the Honorable Edward Livingston to obtain any action of Congress upon it, and the very heavy

charges and expenses which the heirs have been at in the protection and prosecution of their rights, have induced us to examine with the greatest circumspection and attention all the documents of title filed in this claim. We have given it throughout a mature and deliberate investigation, and, seeing the pacific views of the claimants in their renouncement of their rights to any part of the said land, to which a title has been obtained, either by French or Spanish grant, private entry, or otherwise, that may fall within the limits of their grant, and from the fact that the patent mentioned in this claim corresponds with one on the abstract of patents certified by the register of New Orleans, for the use of this office, consequently making it a complete title in form; with no act of the sovereign remaining to be done that the title of the land might be fully vested in D'Auterive, think that a confirmation of such a title is scarcely necessary, though it may be useful. Congress never asserted the right to annul, restrict, or question any genuine complete grant which has been made by the former governments; they were regarded as sacred documents, and respected by the treaty of cession; it was not obligatory on the holders of complete patents to file them with the registers and the receivers. By the fifth section of the act of the 2d of March, 1805, the registers and receivers were requested to make a report on all complete French and Spanish grants, the evidence of which, though not thus filed, may be found on record in the public records of such grants; it was evident the reports on such titles were required for the purpose of ascertaining what lands had ceased to belong to the public domain.

"If the intention of Congress had been to subject these claims to their scrutiny, they would have required of the owners to file them; if the board, on finding in the public records the evidence of a complete grant, would have made any other than a favorable report on it, Congress would never have permitted such a decision; the boards were only to decide on the simple recorded proof, that is, the official copy of the grant, and were to consider it as conclusive evidence; it has accordingly been decided by the Supreme Court of this State, as well as the United States court, that a complete grant is complete evidence of title without any confirmation; and viewing the grant of the claimants, in this report, as of a similar character, and perfectly satisfied as regards the sale from Masse to D'Auterive, the testimony in proof thereof being ample and complete, we cannot do otherwise than recommend this claim for confirmation to the full extent of land that may be found comprised within the boundaries laid down in the concession."

These proceedings were referred, in pursuance of the law, to the Commissioner of the General Land-Office, who gave his opinion that the claim was not valid. A report was then made to Congress, but no action was there had upon the subject.

Under the act of Congress passed on the 17th of June, 1844, entitled " An Act to provide for the adjustment of land claims in the States of Missouri, Arkansas, and Louisiana," the heirs of D'Auterive filed a petition in the District Court of the United States for the District of Louisiana, on the 16th of June, 1846. Attached to the petition was a copy of the report of the commissioners above mentioned. The petition concluded as follows: —

" The petitioners show, that it appears from said statement that the said Bernard D'Auterive occupied said land as a stock-farm, for which purpose it had been granted, up to the time of his death, which occurred in 1776; that the said D'Auterive left a widow and four small children; that in 1779 his widow married Jean Baptiste Degruy; that the said Degruy and his wife continued to occupy said land as a stock-farm, and to cultivate a small part thereof, until 1784, when they removed to the Mississippi; that thereafter the said land, and even the stock kept thereon, were utterly neglected by said Degruy; that in consequence thereof, and on account of their ignorance of said claim, the Spanish authorities in Louisiana granted a considerable, and the most valuable, part of said land to other persons; and that the petitioners, considering the good faith with which said titles were acquired, and to prevent the delays and expenses of litigation, claimed the confirmation of so much only of the aforesaid grant as was not held by titles emanating from the Spanish government and confirmed by the United States, and had not been sold or otherwise disposed of by the United States.

" And the petitioners show, that they now again claim the confirmation of said grant with the same restrictions; that as the petitioners do not intend to interfere with the rights of any persons holding portions of said grant under confirmed Spanish titles, or under purchases from the United States, it is unnecessary to cite said persons; and that, besides them, there are no other persons in possession of portions of said grant except certain settlers, who occupy small parts thereof with the written consent of the petitioners.

" Wherefore the petitioners pray, that the United States of America, by their District Attorney for the District of Louisiana, be cited; that the aforesaid grant be declared valid and confirmed to the petitioners; that thereafter the Surveyor-Gen-

eral of the United States for the State of Louisiana be ordered to survey said lands; that he be further ordered to certify, on the plats and certificates of said survey, what parts of said grant are held under confirmed Spanish titles, and what part, if any, of said grant has been sold by the United States, together with the quantity thereof. And the petitioners further pray, that it may be decreed that they, their heirs and legal representatives, shall have the right to enter the quantity of land so certified to have been sold or disposed of by the United States in any land-office in the State of Louisiana.

(Signed,) L. JANIN, *of Counsel."*

On the 10th of November, 1846, Thomas J. Durant, the District Attorney of the United States, filed an answer, denying all the allegations of the petition.

In April, 1847, the depositions of sundry witnesses were taken by the plaintiffs before N. R. Jennings, Commissioner, and in December, 1847, the cause came on for trial before the District Court.

On the 13th of June, 1848, the District Court gave the following judgment: —

" The court having taken this cause as above entitled under consideration, and having maturely considered the same, doth now, for reasons set forth at length and on file, order, adjudge, and decree, that the petitioners recover the land claimed in their petition, and described in the original grant or concession to them, as exhibited on pages 180 and 181 of the record of French grants; the same having been delivered at the cession of Louisiana to the government of the United States, and deposited in the United States land-office in the city of New Orleans.

" And the court doth further order and decree, that the Surveyor-General of the State of Louisiana do survey the land so decreed to petitioners as aforesaid, and certify on the plats and certificates of survey all such parts of the said grant as may have been sold or otherwise disposed of by the United States.

" And the court doth further order and decree, that the petitioners, or their heirs or legal representatives, shall have the right to enter the quantity of land that may be so certified to have been sold or otherwise disposed of by the United States, in any land-office of the State of Louisiana, according to the provisions of the eleventh section of the act of the 26th of May, 1824.

"Judgment rendered June 13th, 1848. Judgment signed June 17th, 1848.

(Signed,) THEO. H. McCALEB, [SEAL]
*U. S. Judge."*

From this decree the United States appealed to this court.

It was argued by *Mr. Crittenden* (Attorney-General), for the United States, and *Mr. Janin*, for the appellees.

*Mr. Crittenden* made the following points.

I. That the said alleged grant is void, having been made by the French authorities after the Province of Louisiana had been ceded by France to Spain.

By the secret treaty of Fontainebleau, of the 3d of November, 1762, the Province of Louisiana was ceded by France to Spain, and on the 21st of April, 1764, Louis the Fifteenth communicated what had been done to D'Abadie, the director-general and commandant of the Province, ordering him to deliver it up to his Catholic Majesty. The treaty has never been published, but the letter to D'Abadie will be found in the Appendix to 1 Clarke's Land Laws, 976. This letter was printed in New Orleans, in October, 1764, and the intelligence of the cession of the Province caused great commotion and dissatisfaction among the people. D'Abadie having died, Aubrey, who had been commandant of the troops and one of the council, assumed the administration of the government, and, it is alleged, made this grant to the ancestor of the petitioners on the 2d of March, 1765. Ulloa, the first Spanish governor, arrived at a subsequent period, but was compelled to retire from the country, and was succeeded by O'Rielly, under whose administration Spanish authority was secured. The history of the events of this period will be found in the fourteenth chapter of the first volume of Martin's Louisiana.

II. That Spain never acknowledged nor recognized as valid the alleged grant thus made in derogation of her rights and authority.

This is sufficiently evidenced by the fact, that her authorities granted the greatest part of the same land to other persons. That such grants had been made is admitted by the petitioners, but the force of the conclusion thence arising is sought to be evaded by saying that they were made in ignorance of this claim. There is, however, no pretence for such a supposition, for the very book of records on which the petitioners rely to establish the making of their grant must have been in the hands of the Spanish authorities, and come from them into the possession of the United States. The making of so large a grant could not be concealed. The fact is further corroborated by D'Auterive having afterwards, in October, 1775, received a grant of a league of land from Governor Unzaga, in the neighborhood of the alleged grant. Besides, the acts of the parties show that all claim was abandoned.

III. But if the alleged grant was made by competent authority, it is void for uncertainty in the description of the land granted.

IV. That there is no sufficient evidence of the making of the alleged grant, or of the conveyance by Masse to D'Auterive.

V. That the court below had no jurisdiction in this case.

*Mr. Janin,* for the appellees, made the following points.

I. It is contended that the copy of the grant which is in evidence is not sufficient proof of its genuineness. · This copy was taken from the record of French grants in the land-office at New Orleans, and is attested by the Register of that office.

The appellees could not expect this objection, since this copy was admitted in evidence by consent of parties, whereby they were relieved from the necessity either of producing the original or of proving its loss. But were the point open for discussion, it would be easily met by the evidence. The copy was taken from the only record of French grants known to exist in the land-office. This record was always considered as genuine by the successive registers of the land-office, and referred to by them in making their reports on claims to Congress. We have the testimony of an old citizen of New Orleans, who, under the Spanish government, was the private secretary of Governor Gayoso, and occasionally was employed in the Spanish land-office, which was under the control of the Secretary of the government. He recognizes the signature of Governor Gayoso, at the end of this and the other French and Spanish records in the land-office, and presumes, with reason, that they were signed by the Governor when he delivered the land-office to the Intendant Morales, in obedience to the royal order of October 22, 1798 (2 White's Rec. 497). This is beyond doubt one of the records referred to in Morales's letters of October 16, 1797, and March 2, 1799 (2 Land Laws, 541, 550); in the letter of the Secretary of the Treasury of 1805 (2 Laws, Institutions, Opinions, &c. 669); and in the fifth section of the act of Congress of March 2, 1805 (1 Land Laws, 520); and the authenticity of this record was fully recognized by the Supreme Court of Louisiana in the case of Lavergne's Heirs *v.* Elkins, 17 La. Rep. 231.

II. It is not objected that the description of the land in the grant is not sufficiently clear and definite. The land is described as follows: — A tract of land called the prairie of the Vermilion, bounded on the east by the River (now called Bayou) Tortue and Lake Tasse; at the north by the " *mauvais bois* " (low woodland); on the west by the River (now called Bayou) Vermilion; and at the south by a soft prairie. These

are all natural, well-known boundaries. Bayou Tortue and Bayou Vermilion are considerable watercourses, and are still known by the same names; so is Lake Tasse. The land granted is a prairie; its northern boundary is the first woodland — a low swamp — to the north of the prairie, and its southern boundary is the soft or salt marsh which skirts the whole sea-shore of Western Louisiana. The inspection of any map of Louisiana can leave no doubt that a surveyor would not experience the least difficulty in locating the grant.

III. The third objection is, that, the grant being complete and perfect, it requires no confirmation, and could not be made the subject of a suit against the United States under the act of June 17, 1844, and the revived act of May 26, 1824.

The act of 1824 refers in terms to lands claimed " by virtue of any French or Spanish grant, concession, warrant, or order of survey, . . . . . which might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States." This last phrase contemplates evidently incomplete titles only, and refers therefore only to that part of the first phrase which speaks of incomplete titles, that is, " warrants and orders of survey." It could not refer to the owners of grants, whose title was already complete. And yet in the beginning of the section the holders of grants are permitted to file their claims for adjudication, though they might not be compelled to do so. This is not the only instance in the legislation of Congress which afforded to persons claiming under complete grants an opportunity of having their titles and possessions quieted by a decision of the officers of the federal government. The fourth section of the act of March 2, 1805 (1 Land Laws, 519), declares that persons claiming under complete grants *may*, and those claiming under incomplete grants *shall*, file them, &c., &c. Nor was this a work of supererogation. By the cession, the United States acquired the dominium, all lands not previously granted were considered and treated as public property, and the grantees were put upon proof of their titles. It is true, that, by the fifth section of the same act, the boards of commissioners were directed to " decide in a summary way . . . . . on all complete French or Spanish grants, the evidence of which, though not thus filed (by the claimants), may be found of record on the public records of such grants." Had this law been obeyed, the claimants under complete grants would have been spared infinite losses and suffering. But it remained a dead letter in practice. The commissioners and their successors acted upon no claim,

though found in these records, if it was not formally filed with a claim for adjudication, and of claims exceeding a league square they were expressly prohibited to take cognizance. Holders of large grants were in reality remediless, until the later acts of Congress, reopening the land-offices for the adjudication of claims, without restriction as to quantity. And as the commissioners could only recommend their confirmation, and as Congress always discarded large claims in Louisiana in their confirmatory acts, the hopes of the claimants were still deferred. It is thus that large grants of land in Louisiana have uniformly proved a fatal inheritance to the descendants of the old colonists, consuming their lives and fortunes in unceasing and fruitless efforts to obtain a hearing, while the best portions of their lands fell a prey to the squatter. The only remedy left to them, a remedy worse than the evil, was to allow a portion of the land to be sold by the United States, and then to bring suit for it, a process which had to be repeated in the case of each sale, and which yet did not protect the portion of the claim not immediately included in the decision. The officers of the land department uniformly treated as public land whatever had not been recovered by a judgment. This crying evil could not be unknown to Congress, and we submit that the acts of 1824 and 1844 were destined to remedy it, and that it could not be the intention of Congress to treat complete grants less favorably than incomplete ones.

And again, may it not be said that this grant requires a survey to perfect at least the possession of the grantee? And the government surveyors would not make or sanction a survey, unless the claim was recognized by the government.

This grant again required the grantees to abandon the lands they had previously owned; in compensation of which they obtained the new grant, and to establish a stock-farm. Was it then not incumbent upon them to show that they claimed nothing under the older grants, a negative proof, which they could only make by asserting the abandonment and challenging the contrary proof, and that they had established a large stock-farm?

It is obvious that the object of the appellees would be attained by a decision of this court, disclaiming jurisdiction, on the ground that the grant is complete, and not embraced in the act of 1824. A decision of the federal courts, and nothing less, would be respected by the surveying department.

IV. It is finally contended that this grant is invalid because it is dated the 2d of March, 1765, when Louisiana had been ceded to Spain in 1763. It is well known that Spain did not

desire or attempt to take possession until 1769, up to which time all the functions of the government were carried on by the French authorities. The French was the government *de facto.* " Grants made by a government *de facto* are valid against the state which had the right." ,12 Peters, 748. The validity of the acts of a government *de facto* has been acknowledged in many decisions of this court. Delacroix *v.* Chamberlain, 12 Wheaton, 600 ; Pollock's Lessee *v.* Kibbe, 14 Peters, 364; Keene *v.* McDonough, 8 Peters, 310 ; The Fama, 5 Rob. Adm. 113 ; 1 Kent's Com., Lect. VIII. To these familiar au-thorities a striking instance may be added, drawn from modern history. We quote from Lieber's Manual of Political Ethics, Vol. I. p. 324 : " When the Elector of Hesse returned in 1813 to his country, he declared the king of Westphalia, having been a usurper, to have possessed no right of selling the do-mains, and therefore took possession of them without any restitution of the sums for which they had been purchased. Prussia acknowledged the sales which the same kingdom of Westphalia had made of her domains. The Germanic Diet decided against the Elector and for the purchasers, and when that prince for years declined to yield to the Diet and all the endeavors even of Austria were in vain, the Diet ordered the troops of the neighboring members of the confederacy to make the Elector comply with its decision."

History affords, probably, no instance of acts of a govern-ment *de facto* less questionable than those of the French government in Louisiana between 1763 and 1769. The French were ready to deliver the colony, the Spaniards were not ready to receive it; the French were not usurpers, nor the antagonists of Spain, but depositaries of the power of Spain; the wheels of government could not be arrested, and it was one of its ordinary and legitimate functions to promote the settlement of the Province, to develop her industry and to secure her peace, by exchanging D'Auterive's lands on the Upper Teche, where his stock had become troublesome to the new colonists from Acadia, for pasture lands in a more remote and still unsettled district. Neither this nor any other grant made by the French after 1763 resembled the questionable policy of the Spanish Intendant, who after 1803 sold lands in the dis-puted territory to replenish a suffering treasury. The history of the courts and of the land department offers no instance of a grant made by the French after 1763 that was rejected for want of authority. The question was discussed by the Supreme Court in the case of Devall *v.* Chopin, 15 La. Rep. 575, and decided in favor of the power. Spain, after she took possession, never questioned any of these grants; France held

the sovereignty between 1800 and 1803, and could not, if she had taken possession, have contested the validity of the grants of her former governors; the United States succeeded only to the rights of France, and the United States at an early period, in the important act of March 2d, 1805, distinctly recognized the validity of the grants anterior to the 1st of October, 1809, made by France and Spain, during the time those respective governments had the actual possession of the colony. Possession, and not the bare right of sovereignty, was made the test of authority.

We quote from the act of March 2d, 1805, 1 Land Laws, 518.

Sec. 1st. " Any person or persons, or the legal representatives of any person or persons, who, on the 1st of October, in the year 1800, were resident within the territories ceded by the French Republic to the United States, by the treaty of the 30th of April, 1803, and who had p ior to the said 1st day of October, 1800, obtained from the French and Spanish governments, respectively, during the time either of said governments had the actual possession of said territories, any duly registered warrant or order of survey," &c.

Sec. 4th. " Every person claiming lands in the above-mentioned territories, by virtue of any legal French and Spanish grants, made and completed before the 1st of October, 1800, and during the time the government which made such grant had the actual possession of the territories," &c.

Mr. Justice DANIEL delivered the opinion of the court.

The appellees, as heirs of Jean Antoine Bernard D'Auterive, claimed in the court below an extensive tract of land in the county of Attakapas, the quantity of which land is not given, though certain boundaries thereof are set forth in the instrument upon which these appellees prefer their claim. This instrument purports to be a grant from Charles Philippe Aubry, Knight of the Royal and Military Order of St. Louis, Commandant of the King in Louisiana, and Dionysius Nicholas Foucault, filling the functions of director in that Province, to Messrs. D'Auterive and Masse, and bearing date at New Orleans on the 2d day of March, 1765.

The proceedings for the establishment of this claim in the court below were instituted under the authority of an act of Congress of May 26th, 1824, entitled " An Act to enable claimants to land within the State of Missouri and Territory of Arkansas, to institute proceedings to try the validity of their claims "; which law was in part reënacted on the 17th of June, 1844, and extended in its operation to the State of Louisiana. ( *Vide* 5 Stat. at Large, 676.) The purposes and the effect of the

law of 1824, with reference both to the claims and the proceedings embraced within its provisions, have been heretofore examined by this court. They were especially considered at the last term, in the case of the United States v. Reynes, 9 Howard, 127, and the following conclusions were then distinctly enunciated as implied necessarily in a just interpretation of that statute. Thus (pp. 146, 147), in speaking of the statute of 1824, revived by the act of 1844, this court explicitly declare, that, "with respect to that interpretation of these acts of Congress which would expound them as conferring on applicants new rights not previously existing, we would remark, that such an interpretation accords neither with the language nor the obvious spirit of these laws; for if we look to the language of the act of 1824, we find that the grants, surveys, &c., which are authorized to be brought before the courts, are those only which had been *legally* made, granted, or issued, and which were also protected by treaty. The legal integrity of these claims (involving necessarily the competency of the authority which conferred them) was a qualification inseparably associated by the law with that of their being protected by treaty. And as to the spirit and intention of the law, had it designed to create new rights, or to enlarge others previously existing, the natural and obvious means of so doing would have been a direct declaration to that effect: certainly not a provision placing these alleged rights in an adversary position to the government, to be vindicated by mere dint of evidence not to be resisted. The provision of the second section of the act of 1824, declaring that petitions presented under that act shall be conducted according to the rules of a court of equity; should be understood rather as excluding the technicalities of proceedings in courts, than as varying in any degree the rights of parties litigant; as designed to prevent delays in adjudicating upon titles, as is farther shown in another part of the same sentence, where it is declared, that these petitions shall be tried without continuance, unless for cause shown. The limitation, too, maintained as to the character of claims, and that imposed upon the courts in adjudicating upon them, is farther evinced in that part of the same section which says, that the court shall hear and determine all questions relative to the title of the claimants, the extent, locality, and boundaries of the claim, and by final decree shall settle and determine the question of the validity of the title according to the law of nations, the stipulations of any treaty, and proceedings under the same, the several acts of Congress, and the laws and ordinances of the government from which it is alleged to have been derived."

By the meaning and directions of the statute of 1824, as thus expounded, the claim before us must be judged; and the next step in our investigation leads us to consider it as controlled by the law of nations, and the force of treaty stipulations construed in conformity with that law.

The land which is the subject of this controversy was, according to the terms of the instrument adduced by the appellees in the court below as the foundation of their title, granted to their ancestor on the 2d day of March, in the year 1765.

On the 3d day of November, 1762, by a treaty, or, as it is termed in the language of the king, by "a special act" done at Fontainebleau, Louis the Fifteenth ceded to the king of Spain the entire Province of Louisiana, including the island and city of New Orleans. The character and extent of this act of cession, as evinced by the instructions from the French king, dated at Versailles, April 21st, 1764, should be noted in this place, as they are decisive of the relative positions of the parties to that act, and of the extent of their powers posterior thereto, over the territories or persons comprised within its provisions. Nothing surely can be more comprehensive or absolute than the transfer announced by the king of France, or the declaration of his relinquisnment of all power or rights in the subject transferred. The language of the French king to D'Abadie, Director-General and Commandant of Louisiana, is as follows:—"Having ceded to my very dear and best beloved cousin, the king of Spain, and to his successors, in full property, purely and simply and without exceptions, the whole country known by the name of Louisiana"; he proceeds to command his Director-General, that, on the receipt of his instructions, "whether they come to your hands by the officers of his Catholic Majesty, or directly by such French vessels as may be charged with the same, you are to deliver up to the governor or officer appointed for that purpose by the king of Spain, the said country and colony of Louisiana, and the posts thereon depending, likewise the city and island of New Orleans, in such state and condition as they shall be found to be in on the day of the said cession; being willing in all time to come that they shall belong to his Catholic Majesty, to be governed and administered by his governors and officers, and be possessed by him in full property, and without exceptions."

The cases of the United States v. Reynes, and of Davis v. The Police Jury of Concordia, decided at the last term of this court, devolved upon it the necessity for a particular examination of the rules and principles applicable to the construction of treaties; and in the adjudication of the cases above mentioned, the following rules are either explicitly affirmed or

necessarily implied: — That compacts between governments or nations, like those between individuals, should be interpreted according to the natural, fair, and received acceptation of the terms in which they are expressed. That the obligation of such compacts, unless suspended by some condition or stipulation therein contained, commences with their execution, by the authorized agents of the contracting parties; and that their subsequent ratification by the principals themselves has relation to the period of signature. That any act or proceeding, therefore, between the signing and the ratification of a treaty, by either of the contracting parties, in contravention of the stipulations of the compact, would be a fraud upon the other party, and could have no validity consistently with a recognition of the compact itself. As a regular corollary from these principles, and as deducible from the law of reason and the law of nations, it was ruled in the cases just mentioned, that a nation which has ceded away her sovereignty and dominion over a territory could with respect to that territory rightfully exert no power by which the dominion and sovereignty so ceded would be impaired or diminished. *Vide* 9 Howard, 148, 149, and 289, 290, 291.

In the cases just cited, and particularly in that of the United States *v.* Reynes, it became proper to examine the rights of a ceding and retiring government as a government *de facto* over the territory ceded. This examination was induced by the circumstance, that the claimant against the United States rested his pretensions in a great degree upon the position, that after the treaty of St. Ildefonso, and anterior to an actual delivery to the French authorities, the government of Spain as a government *de facto* retained the rights of sovereignty and dominion over the Territory of Louisiana, and, as incident thereto, the power of granting away the public domain. But this court distinguished between the proceedings of an adversary government, acting in the character and capacity of an independent perfect sovereignty, unaffected by any stipulation, and acts done in fraud or in violation of express concessions or compacts. It said that the former, as the acts of a government *de facto*, might be respected and sanctioned by a succeeding power; the latter could impose no obligation to respect them, because they would have been performed in bad faith, and in violation of acknowledged rights existing in others. Admitting the absolute verity of the document under which the appellees deduce their title, and about which no serious question appears to have been raised, can the validity of this title be sustained consistently with the rules and principles propounded above, and in the cases to which reference has been made? The grant

from Aubry and Foucault, the commandant and the director of the Province of Louisiana, to the ancestor of the appellees, bears date on the 2d of March, 1765, between two and three years posterior in time to the cession of the Province by France to Spain; and rather more than ten months after the order from the French monarch for the actual delivery of the territory to the Spanish authorities. Under these circumstances, then, the act of the French officers must be regarded as wholly unauthorized and inoperative to vest any title in the ancestor of the appellees, those acts being inconsistent with the existing relations between the kingdoms of France and Spain. It is true that Spain, during the continuance of her sovereignty and possession in Louisiana, might have adopted and confirmed this grant, but no such recognition thereof by Spain is shown or pretended; so far from there being proof of such recognition, it appears that a large portion of the lands comprised within this grant was bestowed by the Spanish government upon other grantees. Neither is there in the record proof or allegation, that, during the short reign of the French republic under the treaty of retrocession, the claim of D'Auterive was sanctioned, or even brought to the notice of that republic.

It follows, then, from the view of this case here taken, that the claim of the appellees cannot be sustained upon any general and controlling principle of the law of nations, nor upon any stipulation between the powers holding the Territory of Louisiana prior to its transfer to the United States. The fate of this claim must depend exclusively upon the authority and the acts of the government of this country, and we will now consider how far it is affected by those acts and that authority. It has been heretofore repeatedly ruled by this court, that the control and recognition of claims like that now before us were subjects belonging peculiarly to the political power of the government; and that, in the adjudication of those claims, the courts of the United States expound and enforce the ordinances of the political power. Guided by these rules, and looking to the acts of the legislature, we find it declared by the act of Congress of March 26, 1804, § 14 (2 Stat. at Large, 287), "that all grants for lands within the territories ceded by the French republic to the United States by the treaty of the 30th of April, 1803, the title whereof was, at the date of the treaty of St. Ildefonso, in the crown or government of Spain, and every act and proceeding subsequent thereto, of whatsoever nature, towards the obtaining any grant, title, or claim to such lands, and under whatsoever authority transacted or pretended, be, and the same are hereby declared to be, and from the beginning to have been, null, void, and of no effect in law or in

equity." Within the comprehensive language of this provision the case before us necessarily falls; as the inefficiency of the French concession, after the treaty of Fontainebleau, to convey *any* title, left the title in the government of Spain, where it remained up to, and at the date of, the treaty of St. Ildefonso. The reservation in the proviso to the section just quoted, in favor of actual settlers under the laws, customs, and usages of Spain, cannot include the case under consideration, as this is not an instance of a title asserted upon any such laws or usages, or founded on mere settlement; but one professing to be founded upon the grant made by the French commandant, independently of the authority of Spain, and exceeding in extent the quantity of land awarded to settlers by the proviso above mentioned. But it has been contended in the argument filed on behalf of the appellees, that, if any defect could have been alleged against their title by reason of the absence of power in either the French or Spanish governments to make the grant, such defect has been cured by the legislation of Congress; and in support of this provision we have been referred to the act of March 2, 1805 (2 Stat. at Large, 324). The first and fourth sections of that act have not been fully quoted in the argument of the appellees, and it may be that an omission to examine them throughout has produced the strange misapprehension of those provisions which seems to have existed with those who rely upon their operation. Thus from the first section of the act of 1805 the following portion is quoted: " Any person or persons, or the legal representatives of any person or persons, who, on the 1st of October in the year 1800, were resident within the territories ceded by the French republic to the United States, by the treaty of the 30th of April, 1803, and who had, prior to the said 1st day of October, 1800, obtained from the French and Spanish governments, respectively, during the time either of said governments had the actual possession of said territories, any duly registered warrant or order of survey," &c.; but this quotation omits the following terms, which essentially control every part of the section that precedes them; viz. " for lands lying within the said territories to which the Indian title had been extinguished, and which were on that day actually inhabited and cultivated by such person or persons, of for his or their use."

The first requisite prescribed by this section of the law as necessary to give validity to titles resting upon the actual territorial occupation of the French or Spanish authorities is, that the grantees or their representatives should, on the 1st day of October, 1800, be residents within the territories ceded by the French republic to the United States. The next condition im-

posed by this statute is, that the Indian title to such lands should have been extinguished. And thirdly, that the lands thus granted should have been, on the 1st day of October, 1800, actually inhabited and cultivated by the grantees, or for their use. Without inquiring into the fulfilment of the second of these conditions, or into the necessity for its fulfilment, it will be seen that the first and the third, made essential by the statute, have been entirely unperformed. Thus it is stated in the petition of the appellees, that as early as 1784 the family of D'Auterive removed from the State of Louisiana. It is nowhere proved, or even alleged, that at any subsequent period they returned to this land, much less that in 1800, or at any other time posterior to 1784, they resided upon the same, or by themselves or by their agents, or through any instrumentality of theirs, cultivated this land. On the contrary, either of these inferences is irresistibly excluded by the statement in the petition, that, after the removal of the family of D'Auterive, much of this land was, by the Spanish government, during its possession of the country, granted to other persons. The alleged infancy of the children of D'Auterive in the year 1784, even if there had been a saving for the benefit of infants against the requisites of the statute, could scarcely authorize a presumption in their favor, after a lapse of more than half a century, viz. from 1784 to 1837, during which period this claim has been permitted to sleep.

The fourth section of the act of Congress, also quoted in the argument for the appellees, if applicable in any sense to their pretensions, certainly adds nothing to their intrinsic force. This section is a simple requisition, that persons claiming lands within the Territory of Louisiana, by virtue of any *legal* French or Spanish grant made prior to the 1st day of October, 1800, may, and persons claiming lands in the said territories by virtue of any grant or incomplete title bearing date subsequently to the 1st day of October, 1800, shall, before the 1st day of March, 1806, deliver to the register of the land-office or recorder of land-titles within whose district the land may be, a notice in writing, stating the nature and extent of his claims, together with a plat of the tract or tracts so claimed; and shall, also, on or before that day, deliver to the register or recorder, for the purpose of being recorded, every grant, order or survey, deed of conveyance, or other written evidence of his claim. This section then proceeds to declare, as a penalty for noncompliance with its directions, that all the rights of the claimant derived from the first two sections of the act (embracing all grants founded upon mere territorial occupation by France or Spain), shall become void, and for ever after be barred; and that no in-

complete grant, warrant, order of survey, deed of conveyance, or other written evidence, which shall not be so recorded, shall ever be considered or admitted as evidence in any court of the United States, against any grant derived from the United States. But for the act of Congress of the 6th of February, 1835, entitled "An Act for the final adjustment of claims to lands in the State of Louisiana," the fourth section of the act of 1805 would have operated as a complete bar to the claim of the appellees from the 1st day of March, 1806. The act of 1835 removes that bar so far as to permit, within the space of two years from its date, the prosecution of claims similar to that of the appellees, but this act accomplishes nothing beyond this permission. It imparts no merit or strength to any claim which such claim did not previously possess. Upon a view of this case, then, we think that the decision of the District Court should be reversed, and the petition of the appellees dismissed, and that decree is accordingly hereby reversed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Louisiana, and wa argued by counsel. On consideration whereof, it is the op iion of this court, that the title of the petitioners is null and void. Whereupon, it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is hereby, remanded to the said District Court, with directions to dismiss the petition of the claimants in this cause.