[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 11-14774-P

_____

BRANDON ASTOR JONES,

Petitioner - Appellant,

versus

GDCP WARDEN,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

Before MARCUS, WILSON and WILLIAM PRYOR, Circuit Judges:

MARCUS, Circuit Judge:

Over thirty-six years after he robbed and murdered Roger Tackett, petitioner

Brandon Jones is scheduled to be executed by the Georgia Department of

Corrections on February 2, 2016. On January 21, 2016, he moved this Court to

recall its 2014 mandate denying his petition for habeas corpus relief and to

reconsider his original habeas petition after the full Court issues an en banc

decision in a different, although currently pending case, Wilson v. Warden, Georgia Diagnostic Prison. Jones has also filed a motion with this Court to stay his execution pending reevaluation of his original habeas petition in light of the forthcoming Wilson decision. The state opposes both motions.

After carefully reviewing the record before us and the party's submissions, we conclude that we are foreclosed by the Antiterrorism and Effective Death Penalty Act and Supreme Court precedent from recalling the mandate denying habeas relief. Furthermore, even if we were not foreclosed and examined the merits of his motion, we would still deny it because, regardless of how Wilson is decided, Jones's claim is without merit. Finally, even if we could recall the mandate, our respect for the State of Georgia's interest in the finality of its criminal judgments would strongly counsel against doing so. We also deny Jones's motion to stay his execution because, regardless of how Wilson is decided, Jones has not shown a substantial likelihood that he will prevail on the merits of his underlying claim.

## I.

### A.

Jones was originally convicted and sentenced to death by the Superior Court of Cobb County in 1979 for the robbery and murder of Roger Tackett, a convenience store manager. As the state court detailed, Jones and his co-

2

defendant, Van Roosevelt Solomon, were found at the scene of the murder by a police officer. Jones v. State, 293 S.E.2d 708, 709-10 (Ga. 1982) ("Jones I"). The officer approached the convenience store after hours, saw Jones stick his head out of the storeroom door before closing it again, and then heard three gunshots, a pause, and one more shot. Id. The officer found Solomon and Jones in the storeroom, where he later discovered Mr. Tackett's body and two .38 caliber revolvers. Id. at 710. The medical examiner who performed Mr. Tackett's autopsy testified at trial that Mr. Tackett had been shot twice in the hip area, once in the jaw, once in the thumb, and once behind the left ear. Id. Jones and Solomon underwent neutron activation tests and both were found to have recently fired guns. Id. at 710-11.

The Georgia Supreme Court affirmed Jones's conviction and death sentence in 1982. Id. at 715. Jones filed a state habeas corpus petition, which the Superior Court of Butts County denied in 1982; the Georgia Supreme Court affirmed that denial in 1984. Jones v. Francis, 312 S.E.2d 300, 306 (Ga. 1984). The United States Supreme Court denied Jones's petition for a writ of certiorari. Jones v. Francis, 469 U.S. 873 (1984). Jones then petitioned for habeas relief in federal district court, and a district court judge in the Northern District of Georgia granted the petition in part and ordered a new sentencing proceeding because the state trial

3

court had improperly allowed the jury to bring a Bible into the deliberation room. See Jones v. Kemp, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989).

In 1997, the Superior Court of Cobb County sentenced Jones to death a second time. See Jones v. State, 539 S.E.2d 154, 157 (Ga. 2000) ("Jones II"), reh'g den. Dec. 14, 2000, cert. den. 534 U.S. 839 (2001). The Georgia Supreme Court again affirmed Mr. Jones's death sentence. Id. Jones filed a pro se petition for a writ of habeas corpus in Butts County Superior Court, which was later amended by counsel. The superior court denied all claims for relief. Jones v. Terry, Case No. 2002-V-79 (unpublished order of March 17, 2006). The Georgia Supreme Court summarily denied his Application for Certificate of Probable Cause to Appeal on September 3, 2008. Jones v. Terry, No. S06E1736 (Ga. September 3, 2008).

On May 8, 2009, he commenced federal habeas corpus review pursuant to 28 U.S.C. § 2254, raising eleven grounds for relief. On August 10, 2011, the district court in the Northern District of Georgia denied his petition in its entirety in an unpublished order, but granted Jones a certificate of appealability on two claims: (1) that Jones's trial counsel provided ineffective assistance of counsel in violation of Strickland v. Washington, 466 U.S. 668 (1984), by failing to investigate certain sources of potential mitigation evidence, and (2) that the prosecution's comments made during closing argument at Jones's sentencing

4

violated his privilege against self-incrimination. See Order, Jones v. Hall, No. 09-cv-01228-CAP (N.D. Ga. August 10, 2011) (Docket No. 45).

On March 20, 2014, our Court affirmed the district court's denial of relief on both of those claims. See March 20, 2014 Opinion (appended hereto as Attachment A). In that decision, we reviewed "the Superior Court's denial of habeas relief" as the final state-court determination of Jones's claim, "[s]ince the Georgia Supreme Court declined to review the merits of the case." See id. at 21 n.4. On April 24, 2014, we withdrew our March opinion and issued an amended decision, again affirming the district court. Jones v. GDCP Warden, 753 F.3d 1171 (11th Cir. 2014) ("Jones III"). In the amended decision, however, we recognized that "[t]he Georgia Supreme Court's denial of the application for a certificate of probable cause to appeal was the final state-court determination" of Jones's claim. Id. at 1182. Jones filed a petition for rehearing en banc, which our Court denied on December 1, 2014. Our mandate issued on December 10, 2014. Jones then petitioned the Supreme Court of the United States for a writ of certiorari, which was denied on October 5, 2015. Jones v. Chatman, 136 S. Ct. 43 (2015). And on November 30, 2015, the Supreme Court denied his Petition for Rehearing from the denial of certiorari. Jones v. Chatman, 136 S. Ct. 570 (2015).

Soon thereafter, on December 22, 2015, Jones filed a complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the Northern District of

5

Georgia, challenging the constitutionality of Georgia's method of execution.  On January 13, 2016, pursuant to the state's motion, the Cobb County Superior Court issued an order authorizing an execution window for Jones, and the Georgia Department of Corrections scheduled his execution for **February 2, 2016 at 7:00 p.m. EST**.

The district court dismissed Jones's civil rights complaint on January 21, 2016.  It first held that Jones's challenge to Georgia's method of execution is time-barred, since the statute of limitations on his claim ran on October 4, 2003, and there was no "significant change" to the lethal injection protocol that would reset the time clock.  The district court also rejected his challenge on the merits.  Based on binding prior precedent from this Court, the district court held that Jones had failed to state a claim under either the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment.  See Terrell v. Bryson, 807 F.3d 1276 (11th Cir. 2015); Gissendaner v. Comm'r, Ga. Dep't of Corr., 803 F.3d 565 (11th Cir. 2015); Gissendaner v. Comm'r, Ga. Dep't of Corr., 779 F.3d 1275, 1283 (11th Cir. 2015); Wellons v. Comm'r, Ga. Dep't of Corr., 754 F.3d 1260, 1267 (11th Cir.

6

2014). On January 25, 2016, Jones appealed from the decision of the district court dismissing his § 1983 complaint.[1]

## B.

After we had issued our decision affirming the denial of Jones's habeas petition (Jones III), another panel of this Court decided Wilson v. Warden, Georgia Diagnostic Prison, 774 F.3d 671 (2014). In that case, the Wilson panel relied on our amended decision in Jones III to observe that "the one-line decision of the Supreme Court of Georgia denying Wilson's certificate of probable cause is the relevant state-court decision for our review because it is the final decision 'on the merits.'" Id. at 678. On July 30, 2015, our Court granted rehearing en banc in Wilson, vacated the panel opinion, and directed the parties to address en banc:

> [Whether] a federal habeas court [is] required to look through a state appellate court's summary decision that is an adjudication on the merits to the reasoning in a lower court decision when deciding whether the state appellate court's decision is entitled to deference under 28 U.S.C. § 2254(d)[.]

Oral argument was held by our Court en banc on October 20, 2015. Soon thereafter, we directed counsel to file supplemental briefs addressing a subsidiary question:

---

[1] Jones's appeal from the district court's rejection of his § 1983 complaint asks our full Court to review initially the matter en banc. He has also filed an Emergency Motion to Stay Execution until the Court rules on his en banc petition. We will address these motions by separate order.

7

> [W]hether the denial of an application for a certificate of probable cause by the Georgia Supreme Court is an adjudication on the merits for purposes of § 2254(d).

An en banc decision in the Wilson case is still pending in the Court.

Just last week, on January 21, 2016, Jones moved this Court to stay his execution pending the resolution of Wilson by our en banc Court. That same day, he also moved this Court to recall the mandate in Jones III so that we could reevaluate his original habeas petition after Wilson is decided. The essence of his argument in both motions is that the Wilson decision is "likely to [] reverse the case law governing federal habeas review" that we applied in Jones III and that, under the "look through" approach that Jones anticipates we will adopt in Wilson, we would likely have found the ineffective-assistance-of-counsel claim in his original habeas petition meritorious.[2]

We address these two motions today.

## II.

### A.

The Supreme Court has recognized that the federal courts of appeals "have an inherent power to recall their mandates, subject to review for an abuse of

---

[2] The habeas petition that we addressed in Jones III contained a second claim relating to the prosecutor's alleged comments about Jones's failure to testify during closing arguments. See Jones III, 753 F.3d at 1194. However, that claim was denied on the merits in a written decision by the Georgia Supreme Court on direct appeal. See Jones II, 539 S.E.2d at 159-60. Jones does not argue that our review of that claim implicated the issues to be decided in Wilson.

8

discretion." <u>Calderon v. Thompson</u>, 523 U.S. 538, 549 (1998). However, "[i]n light of the profound interests in repose attaching to the mandate of a court of appeals," the Court has cautioned that "the power can be exercised only in extraordinary circumstances." <u>Id.</u> at 550 (quotation omitted). Indeed, recall of a mandate is a "last resort" that should be used only in the face of "grave, unforeseen contingencies." <u>Id.</u>

Our limited discretion to recall a mandate is further circumscribed in this case because Jones is ultimately seeking relief from a state court criminal judgment. Consequently, we are required to measure his motion "not only against standards of general application, but also against the statutory and jurisprudential limits applicable in habeas corpus cases." <u>Id.</u> at 553. The habeas petition that we denied in <u>Jones III</u> was filed after April 24, 1996, and thus is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Title 28 U.S.C. § 2244(b), as amended by AEDPA, provides:

> **(1)** A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.
>
> **(2)** A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--
>
>> **(A)** the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

9

**(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

**(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The Supreme Court has explained that a motion to recall a mandate denying habeas relief generally must be regarded as a second or successive habeas petition:

> In a § 2254 case, a prisoner's motion to recall the mandate on the basis of the merits of the underlying decision can be regarded as a second or successive application for purposes of § 2244(b). Otherwise, petitioners could evade the bar against relitigation of claims presented in a prior application, § 2244(b)(1), or the bar against litigation of claims not presented in a prior application, § 2244(b)(2). If the court grants such a motion, its action is subject to AEDPA irrespective of whether the motion is based on old claims (in which case § 2244(b)(1) would apply) or new ones (in which case § 2244(b)(2) would apply).

Calderon, 523 U.S. at 553.

"Under § 2244(b), the first step of analysis is to determine whether a 'claim presented in a second or successive habeas corpus application' was also 'presented in a prior application.' If so, the claim <u>must be dismissed</u>; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions." Gonzalez v. Crosby, 545 U.S. 524, 530 (2005) (emphasis added). Jones's motion to recall is based on precisely the same claims we decided when we denied his original § 2254 petition; it does not raise any new claims not presented or fully adjudicated

10

in his first habeas application. The <u>Strickland</u> claim that he asserted in his original habeas petition alleged that "the Georgia state courts unreasonably applied <u>Strickland</u> when they concluded that his trial counsel's investigation of mitigating evidence was not deficient and, second, that there was no reasonable probability that the additional mitigating evidence discovered by Jones's habeas counsel would have altered the outcome of his trial." <u>Jones III</u>, 753 F.3d at 1183-84. In his motion to recall the mandate, Jones asks us to reconsider that <u>Strickland</u> claim by measuring it against the decision of the Georgia state superior court, instead of the Georgia Supreme Court's determination. Quite simply, the claim is the same and is therefore barred by 28 U.S.C. § 2244(b)(1).

But even if Jones's ineffective assistance claim had not been presented in a previous application and this motion was governed by § 2244(b)(2) rather than § 2244(b)(1), we would still be compelled to dismiss it because it does not fall within either of that provision's narrow exceptions to dismissal for claims that: (i) rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court," or (ii) rely on a "factual predicate [that] could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2). His claim relies on the same Supreme Court case law governing ineffective assistance of counsel -- <u>Strickland v. Washington</u>, 466 U.S. 688 (1984) and its progeny -- and not on any new rule of constitutional law. And he does not

11

rely on any new evidence that was not presented and considered in his original habeas petition.

Jones's motion to recall the mandate is effectively a second or successive habeas corpus petition; it does not satisfy any of the statutory exceptions to dismissal; and therefore it must be denied.

### B.

The Supreme Court, however, has provided one other possible avenue by which a court of appeals can recall a mandate denying habeas relief. In cases "where a motion to recall the mandate is pending," a court may in very limited circumstances "recall[] the mandate by its own initiative." Calderon, 523 U.S. at 554. Accordingly, we still retain authority to recall the mandate sua sponte, "on the exclusive basis of [Jones's] first federal habeas petition." Id. However, we can only do so in very limited circumstances. "[W]here a federal court of appeals sua sponte recalls its mandate to revisit the merits of an earlier decision denying habeas corpus relief to a state prisoner, the court abuses its discretion unless it acts to avoid a miscarriage of justice as defined by [the Supreme Court's] habeas corpus jurisprudence." Id. at 558.

Jones faces two insurmountable obstacles. First, were we to recall the mandate, we would not be acting sua sponte. Rather, we would be considering whether to recall our mandate denying Jones's habeas relief only because he filed a

12

motion asking us to do so.  Second, Jones has not demonstrated that a failure to recall the mandate in his case would result in a miscarriage of justice.  Because the ineffective assistance claim that Jones seeks to relitigate challenged his death sentence and not his underlying murder conviction, the "miscarriage of justice" exception requires him to show that he is "actually innocent of the death penalty to which he has been sentenced." Sawyer v. Whitley, 505 U.S. 333, 349 (1992); see also Gonzalez v. Sec'y for Dep't of Corr., 366 F.3d 1253, 1275 (11th Cir. 2004) (en banc) ("If . . . a court of appeals is considering recalling the mandate on its own motion, the literal terms of § 2244(b) do not apply, but the mandate cannot be recalled unless necessary to prevent a miscarriage of justice; that means the petitioner must be factually innocent of the crime, or of the sentence, as defined in the pre-AEDPA federal habeas jurisprudence.").  This narrow exception requires him to "show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." Sawyer, 505 U.S. at 336 (emphasis added).  In deciding whether he has made that showing, we "must focus on those elements that render a defendant eligible for the death penalty [under the relevant state's law], and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." Id. at 347.

13

Under Georgia's death penalty statute at the time of Jones's trial, which remains in effect today, a defendant who committed murder was not eligible for the death penalty unless the jury found at least one statutory aggravating factor proven beyond a reasonable doubt. See Ga. Code Ann. § 17-10-30(c) (1997). In Jones's second sentencing trial, the jury found two statutory aggravating factors: "Jones committed the offense of murder while engaged in the commission of armed robbery and burglary" and "the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture to the victim before death." Jones II, 539 S.E.2d at 157 (citing Ga. Code Ann. § 17-10-30(b)(2) & (7)). The Georgia Supreme Court found that these aggravating circumstances were adequately supported by the evidence relating to the manner in which the crime was committed. See id. at 158. The ineffective assistance claim in Jones's original petition alleged that his counsel "fail[ed] to discover mitigating background and mental health evidence." Jones III, 753 F.3d at 1173. This evidence "could have been helpful to his arguments at sentencing," as "evidence of Jones's psychiatric problems may have bolstered the argument that Solomon, not Jones, was the driving force behind the decision to rob the store" and "details regarding Jones's childhood with his abusive uncle and sexually abusive cousin and [placement] at a deplorable juvenile detention center may have supported the argument that Jones was not fully culpable for his actions, and may have cast him in a more

14

sympathetic light." Id. at 1185. This evidence, if credited, could have diminished Jones's moral culpability in the eyes of the jury. But it would have been irrelevant to the two aggravating circumstances found by the jury, which depended solely on the manner in which the murder was committed and were the "elements that render[ed Jones] eligible for the death penalty." Sawyer, 505 U.S. at 347.

Because Jones's claim involves only "additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error," id., he has not shown that a miscarriage of justice will result if we do not recall the mandate denying his habeas petition. To recall our mandate in these circumstances sua sponte would constitute a clear abuse of discretion. Calderon, 523 U.S. at 566.

Accordingly, we hold today that Jones cannot recall the mandate of this Court because he cannot satisfy the requirements found in 28 U.S.C. § 2244(b)(1) or (2), and, in any event, because he has not and cannot establish on this record any miscarriage of justice as required by controlling Supreme Court precedent.[3]

---

[3] Our concurring colleague suggests that this discussion about AEDPA and the controlling law found in Calderon is dicta. We view the application of AEDPA and this Supreme Court precedent as being essential to our holding in this case. Indeed, we do not believe we could address the merits of his petition without first deciding whether it fit within any of the exceptions to 28 U.S.C. § 2244(b). See 28 U.S.C. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of [§ 2244(b)]." (emphasis added)).

15

## C.

Jones makes almost no mention of AEDPA or <u>Calderon</u>, instead arguing that the controlling standard for recalling the mandate in his case comes from our local rules. Eleventh Circuit Rule 41-1 is the general rule governing the recall of a mandate in civil and criminal cases alike, and provides that "[a] mandate once issued shall not be recalled except to prevent injustice." 11th Cir. R. 41-1(b). In <u>Scott v. Singletary</u>, 38 F.3d 1547, 1551 (11th Cir. 1994) -- which we decided prior to the enactment of AEDPA and the Supreme Court's decision in <u>Calderon</u> -- we held that we could recall a mandate to prevent injustice in a habeas case "if there has been a supervening change in the law" that "seriously undermine[d] the correctness of [our] prior judgment." Judge Anderson, joined in relevant part by Judge Dubina, specially concurred in <u>Scott</u>, explaining that Rule 41-1(b) imposes a "high standard" that must be met to recall a mandate, requiring the petitioner to show a "<u>clear</u> constitutional error" that prejudiced him. <u>Id.</u> at 1557-59 (Anderson, J., concurring specially).

The Rule 41-1(b) "injustice" standard that we explicated in <u>Scott</u> no longer provides an independent basis to recall the mandate in habeas cases. The Supreme Court has instructed us that a distinct standard governs the decision to recall a mandate denying habeas relief. <u>See</u> <u>Calderon</u>, 523 U.S. at 553 ("Thompson's <u>is</u> not an ordinary case, however, because he seeks relief from a criminal judgment

16

entered in state court. To decide whether the Court of Appeals' order recalling the mandate was proper in these circumstances, we measure it <u>not only against standards of general application</u>, but also against the statutory and jurisprudential limits applicable in habeas corpus cases." (emphasis added)). Such a motion must fall within an exception to dismissal contained in 28 U.S.C. § 2244(b). In addition, we may recall the mandate on our own initiative to prevent "a miscarriage of justice as defined by [the Supreme Court's] habeas corpus jurisprudence." <u>Calderon</u>, 523 U.S. at 558. Unlike the "injustice" standard we described in <u>Scott</u> and on which Jones exclusively relies, a "miscarriage of justice" in the habeas context depends not on a subsequent change in the law, but rather on the discovery of "new evidence of innocence." <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995). The general "injustice" standard embodied in our local rule is different from and less demanding than the standard subsequently adopted by the Supreme Court, and, therefore, no longer provides an independent ground to recall a mandate in a habeas case.

But even if Rule 41-1(b)'s "injustice" standard governed our decision in this case, we would still decline to recall the mandate because no "injustice" will result if our original denial of habeas relief stands. There has been no supervening change in the law in this case. Jones predicts that this Court will change the rules governing federal habeas review in <u>Wilson</u> and adopt the rule he favors, but he is

17

only guessing. Without an actual change in the law, no injustice results from leaving a prior decision undisturbed.

Furthermore, and tellingly, whether or not this Court rules in <u>Wilson</u> that we look through the Georgia Supreme Court's summary denial of a Certificate of Probable Cause ("CPC") and evaluate the Georgia state superior court's habeas denial as the state's final "adjudication on the merits" under § 2254(d), the result will be exactly the same in this case. The procedural anomaly here is that we have already fully evaluated Jones's <u>Strickland</u> claim both ways, the first time actually by "looking through" to the state trial court's habeas determination, <u>see</u> March 20, 2014 Opinion at 21 n.4, and then a second time in an amended opinion measuring his claim against the determination of the Georgia Supreme Court, <u>Jones III</u>, 753 F.3d at 1182. In each instance, we determined that Jones had not met his burden under AEDPA. Neither the state trial court's habeas determination, nor the Georgia Supreme Court's denial of a CPC were contrary to or amounted to an unreasonable application of <u>Strickland</u>. In short, this Court has already performed precisely the same analysis Jones now asks for by seeking a recall of the mandate -- a review of his <u>Strickland</u> claim when measured against the state trial court's determination.

This Court in both its March 2014 opinion <u>and</u> in the amended April 2014 decision engaged in an extensive and identical analysis of the facts adduced at the

18

state habeas evidentiary hearing relating to the mitigating evidence Jones claimed his trial counsel should have presented to the jury at his sentencing hearing. The only change was the state court opinion that we considered as the "final adjudication on the merits" under 28 U.S.C. § 2254(d).

This Court specifically weighed the totality of the aggravating evidence against the totality of the mitigating evidence, the new and the old, the good and the bad, and we concluded that Jones had failed to establish that he was entitled to habeas relief. In our March 2014 opinion, we ultimately concluded that the "state [trial] court's determination that Jones did not raise a reasonable probability of a different result is not contrary to or an unreasonable application of Strickland." March 20, 2014 Opinion at 29. We reached precisely the same conclusion on precisely the same evidential foundation when we measured the evidence and the commands of AEDPA against the Georgia Supreme Court's determination. See Jones III, 753 F.3d at 1185.

Nevertheless, Jones insists that, if we analyze the state habeas court's decision under the "look through" approach, we would find his ineffective assistance claim meritorious. He offers two reasons why, in his view, the Georgia superior court contravened federal law when it found that, had counsel presented mitigating evidence based on the leads that the defense investigator collected in the Stapert file, the state would have introduced additional aggravating evidence culled

19

from the same file.  But in both the March and April opinions, we rejected each of those arguments, as well as others in the same vein.  See March 20, 2014 Opinion at 43 ("Jones advances several reasons why some of the aggravating evidence developed in the habeas proceeding would not be admissible at a new sentencing trial.  We remain unpersuaded."); see also Jones III, 753 F.3d at 1190-91 (same).

First, he argues that any information drawn from the Stapert file would have been privileged and undiscoverable by the State.  We squarely rejected this claim in both opinions, explaining that it presented a question of state law and "state courts are the ultimate expositors of state law." March 20, 2014 Opinion at 43; see also Jones III, 753 F.3d at 1191 (same).  Furthermore, we found that in a sentencing retrial the Stapert file would be available for use by the state because, "by bringing this habeas action first in state court, and then again in federal district court, Jones has waived any current or future privilege or work-product protection over the Stapert file." March 20, 2014 Opinion at 43-44; see also Jones III, 753 F.3d at 1191 (same).  Second, Jones contends that much of the aggravating evidence relied on by the state habeas court was "rank and inadmissible hearsay." But we also directly confronted and rejected this argument in both the March and April opinions, explaining that "we cannot find unreasonable the state court's determination that the contents of the Stapert file w[ere] admissible hearsay." March 20, 2014 Opinion at 45; Jones III, 753 F.3d at 1192 (same)

20

The "injustice" standard that generally governs our decision whether to recall a mandate does not apply to habeas review of state criminal convictions. But, even if it did, we have already considered Jones's ineffective assistance claim by "looking through" the Georgia Supreme Court's CPC denial to the state superior court's reasoned opinion and have found it unmeritorious. Thus, regardless of how <u>Wilson</u> is decided, Jones cannot show that any injustice could result if we do not re-evaluate his ineffective assistance claim after <u>Wilson</u> is decided.

### D.

Finally, even if Jones could surmount these huge hurdles, on this record we would still be loath to now recall our 2014 mandate denying habeas relief because to do so would unjustifiably subvert Georgia's interest in the finality of its criminal judgments. Jones insists that the pending <u>en banc</u> decision in <u>Wilson</u> provides a sufficient justification to reopen his case. But we are aware of no case -- and Jones has cited none -- where we recalled a mandate because we subsequently granted <u>en banc</u> consideration of a different matter in a different case.

Recalling a mandate based on speculation about how we might resolve a subsequent <u>en banc</u> case is especially inappropriate in the habeas context, where federal courts must respect the state's interest in "the finality of convictions that have survived direct review within the state court system." <u>Brecht v. Abrahamson</u>,

507 U.S. 619, 635 (1993). These interests are particularly "compelling when a federal court of appeals issues a mandate denying federal habeas relief." Calderon, 523 U.S. at 556. The Supreme Court has explained the rationale this way:

> When lengthy federal proceedings have run their course and a mandate denying relief has issued, finality acquires an added moral dimension. Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out. To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike.

Id. (citations and quotations omitted).

Indeed, "[n]o one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation." Teague v. Lane, 489 U.S. 288, 309 (plurality op.) (quoting Mackey v. United States, 401 U.S. 667, 691 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). In a case such as this one, where a court of appeals is asked to "recall[] its mandate to revisit the merits of its earlier decision denying habeas relief," "the State's interests in finality are all but paramount." Calderon, 523 U.S. at 557. If our decision to rehear a different case involving a related question en banc provided a basis to recall our mandate denying habeas relief, our decisions would amount to interlocutory orders subject to constant reconsideration.

22

Moreover, the legal change that Jones anticipates we will adopt in <u>Wilson</u> is simply not the type of new legal rule that would entitle him to relitigate his original habeas petition. The questions being considered in <u>Wilson</u> involve which state court decisions federal habeas courts ought to review under 28 U.S.C. § 2254(d), and have no bearing on the legal standards that state courts must apply in examining a <u>Strickland</u> claim. The purpose of federal habeas review is to encourage state "trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards." <u>Teague</u>, 289 U.S. at 306 (plurality op.) (quoting <u>Desist v. United States</u>, 394 U.S. 244, 262-63 (1969) (Harlan, J., dissenting)). In light of this purpose, the Supreme Court has held that, within very narrow exceptions, "the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place" in order "to force the trial and appellate courts to toe the constitutional mark." <u>Id.</u> at 306-07 (quotations and alterations omitted). Justice O'Connor, writing for a plurality in <u>Teague v. Lane</u>, concluded that habeas review does not exist just to serve some "perceived need to assure that an individual accused of a crime is afforded a trial free of constitutional error," <u>id.</u> at 308 (quoting <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 447 (1986) (plurality op.)); instead, weighty "interests of comity and finality" persuaded the Court that new rules

23

governing criminal prosecutions generally should not be applied retroactively on collateral review to cases that are already final, id.

The same interests of federalism, comity, and finality that guided the Supreme Court's decision in Teague apply here but with even more compelling force.  To undo and reconsider our settled decisions denying habeas relief based on a new rule governing which state court decision federal habeas courts review would do nothing to further the goals of habeas review, and would eviscerate "the principle of finality which is essential to the operation of our criminal justice system." Id. at 309.

In short, recalling our mandate denying habeas relief at this late stage -- thirty-six years after the murder and first death sentence was imposed, nineteen years after the second death sentence was imposed and fifteen years after it became final, seven years after Jones filed his current federal habeas petition, and thirteen months after we declined to rehear his case and issued our mandate denying habeas relief -- would "inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." Calderon, 523 U.S. at 556 (internal citation and quotation omitted).  These interests too counsel against recalling our mandate.

III.

Jones has also moved this Court to stay his execution so that we may reconsider our denial of the ineffective-assistance-of-counsel claim asserted in his original habeas petition after Wilson is decided. It is by now clear that we may grant a stay of execution only if Jones establishes that: "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." See Powell v. Thomas, 641 F.3d 1255, 1257 (11th Cir. 2011) (emphasis added). Because Jones cannot show a substantial likelihood of success on the merits, we deny his motion for stay.

For the reasons we have explained at some length, we cannot, on this record and in this procedural posture, recall our earlier mandate denying Jones's habeas petition. And without recalling our mandate, there is no procedural vehicle by which we could reevaluate Jones's previously denied habeas claims. Were he to file a new habeas petition under 28 U.S.C. § 2254, again seeking to raise the ineffective-assistance-of-counsel claim that we have already denied, it would have to be dismissed. See 28 U.S.C. § 2244(b)(1). For that reason alone, Jones has not shown a substantial likelihood that he will succeed on the merits of his ineffective assistance claim.

25

But even if we could lawfully recall the mandate, await the resolution of Wilson en banc, and Wilson were to require the "look through" approach under 28 U.S.C. § 2254(d), Jones still could not succeed on the merits of his claim. We repeat: in the unique circumstances of this case, we have already seen the flip side of the Wilson coin. In our now-withdrawn March 20, 2014 opinion, we employed precisely the mode of analysis that Jones argues we should use and we rejected his ineffective assistance claim. He has offered no new arguments to reconsider the soundness of that decision even if we were able to examine it still again. Quite simply, because we have already rejected his ineffective assistance claim whether measured against the trial court's ruling or based only on an analysis of the Georgia Supreme Court's Certificate of Probable Cause determination, Jones cannot show a substantial likelihood of success on the merits.

## IV.

In sum, we conclude that to recall our mandate denying Jones's habeas petition would amount to an abuse of discretion; that, even if we could recall the mandate we would not because no "injustice," let alone a "miscarriage of justice," will result from allowing our prior decision to rest undisturbed; and that disturbing the finality of our decision denying habeas relief in this case would be inappropriate in light of Georgia's powerful interest in the finality of its criminal judgments. For the same reasons, we also conclude that Jones has failed to

26

establish a substantial likelihood that he will succeed on the merits of his ineffective-assistance-of-counsel claim.   Accordingly, we deny both his motion to recall the mandate and his corollary application to stay execution.

**MOTION TO RECALL MANDATE AND MOTION FOR STAY OF EXECUTION DENIED.**

WILSON, Circuit Judge, concurring:

As stated by the Majority, "[t]he essence" of Jones's argument in both of his motions is that our pending en banc decision in <u>Wilson v. Warden, Georgia Diagnostic Prison</u>[1] will "reverse the case law governing federal habeas review that we applied" to his <u>Strickland</u> claim and that, "under the 'look through' approach that Jones anticipates we will adopt in <u>Wilson</u>, we would likely have found" his <u>Strickland</u> claim meritorious. Maj. Op. at 8 (internal quotation marks omitted). In other words, Jones's requests for relief are based solely on his contention that his <u>Strickland</u> claim would prevail under the "look through" approach. Accordingly, as the Majority itself acknowledges, its finding that Jones's <u>Strickland</u> claim would clearly fail under that approach is dispositive. <u>See</u> Maj. Op. at 20, 25–26. I agree with the Majority on this point—we must deny Jones's motions because, even if we applied the "look through" approach, his <u>Strickland</u> claim would not succeed. Since this issue is dispositive, the Majority's discussion beyond its "look through" determination is "not necessary to decid[e]" Jones's case, making it dicta. <u>See</u> <u>United States v. Eggersdorf</u>, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997). Although such discussion is extraneous, I do not agree with the reasoning therein and, therefore, concur only in the result.

---

[1] 774 F.3d 671 (11th Cir. 2014), <u>reh'g en banc granted</u>, <u>opinion vacated</u> (July 30, 2015).

28

ATTACHMENT "A"

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14774

_____

D.C. Docket No. 1:09-cv-01228-CAP

BRANDON ASTOR JONES,

Petitioner - Appellant,

versus

GDCP WARDEN,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 20, 2014)

Before MARCUS, WILSON and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

In 1979, Petitioner Brandon Astor Jones was convicted of malice murder in

Georgia state court. Jones and his co-defendant, Van Roosevelt Solomon, killed

Roger Tackett, the manager of a Tenneco convenience store, in the course of an armed robbery and burglary. Jones was sentenced to death, but the United States District Court for the Northern District of Georgia later granted Jones's petition for a writ of habeas corpus in part and vacated his sentence only. This appeal concerns two errors that, Jones claims, infected his <u>second</u> penalty-phase trial, which also resulted in a sentence of death. The Georgia state courts, both on direct appeal and during collateral habeas proceedings, rejected all of Jones's attacks on his sentence, and the federal district court denied Jones's second petition for a writ of habeas corpus in its entirety.

After thorough review, we affirm. We conclude that the state habeas court's rejection of Jones's ineffective-assistance claims was not an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The state habeas court did not unreasonably determine that Jones suffered no prejudice from his counsel's failure to discover mitigating background and mental health evidence, especially in light of the substantial aggravating circumstances that would also have been revealed in the investigation and presentation of this "new" mitigating evidence. Jones raises a Fifth Amendment claim regarding the prosecutor's comments during his closing argument too, but that claim is also unavailing. Therefore, we affirm the district court's denial of habeas relief.

I.

2

## A.

The Georgia Supreme Court's denial of Jones's direct appeal, which

followed his second penalty-phase trial, summarized the essential facts of this case:

[T]he evidence showed that the victim, Roger Tackett, was the manager of a Tenneco convenience store. On June 16, 1979, he arrived at the store at 11:20 p.m. to close it for the night. After the other employees left, Tackett remained at the store to complete some paperwork. At approximately 1:45 a.m., Officer Kendall of the Cobb County police department drove a stranded motorist to the Tenneco parking lot so she could use a pay phone. Officer Kendall observed a car (Tackett's) parked in front of the store with the driver's-side door open; the lights were also still on inside the store. Since the Tenneco store was in his regular patrol area, Officer Kendall knew that it usually closed at midnight. Suspicious, he walked to the store and saw through the front window Brandon Jones stick his head out of the storeroom door at the back of the store, look around (apparently without seeing the officer), and then close the storeroom door. Officer Kendall entered through the unlocked front door and heard three shots, a pause, and then a fourth shot. He drew his weapon and after shouting "police, come on out" without a response, approached the storeroom door and opened it. Jones and his co-defendant, Van Roosevelt Solomon, were standing just inside the door. Officer Kendall ordered them into the main store area, where he searched them and handcuffed Jones. He placed Solomon in his patrol car since he only had one set of handcuffs, and called for assistance on the radio. He also informed both defendants of their rights under Miranda v. Arizona.

A private security officer, Alex Woolyard, heard Officer Kendall's request for assistance on a police scanner and arrived first. He loaned Officer Kendall a set of handcuffs to restrain Solomon and watched the defendants while Officer Kendall investigated a van parked nearby. During this time, Woolyard spoke with Jones and determined that the car parked in front of the store did not belong to them; they had arrived in the van. Upon continued questioning by Woolyard, Jones stated that they had come to burglarize the store and found a man who was "bad hurt" in the back of the store. After

3

/

handcuffing Jones to a metal pole, Woolyard and Officer Kendall entered the store and discovered that the storeroom door had locked when it shut as the defendants exited. They used a crowbar to break open the door and they found Tackett's body lying face-down at one end of the narrow storeroom (Officer Kendall had not seen the victim when he first encountered the defendants in the storeroom since he did not enter the storeroom at that time). Tackett had been shot five times from behind, once in the jaw, once behind the left ear, once in the thumb, and twice in the right hip. The medical examiner determined that the fatal shot was the "loose contact" shot behind the left ear since that bullet penetrated the brain; this shot was probably the final shot and was fired while the victim was lying on the ground. Two .38 caliber revolvers were found in an open box next to where Officer Kendall had first encountered the defendants. A large Smith and Wesson contained two spent shells; a smaller Colt contained four spent shells. Four .38 caliber bullets were recovered at the scene or in the victim's body; the ballistics expert determined that all were probably fired by the Colt. Crime scene photographs also show a possible bullet hole in a shelf on the wall, indicating a fifth shot may have been fired in the storeroom. An atomic absorption test conducted on swabs of the defendants' hands indicated that both men had recently fired a gun or handled a recently fired gun. The store's cash drawer was found moved from its original place inside the store and wrapped in a plastic bag. Inside the van, which belonged to Solomon, the police discovered burglary tools, holsters that fit the revolvers and .38 caliber bullets.

Jones v. State, 539 S.E.2d 154, 157-58 (Ga. 2000) ("Jones II").

## B.

In 1979, both Jones and his co-defendant Solomon were indicted for malice murder, convicted in separate jury trials, and sentenced to death. The Georgia Supreme Court affirmed Jones's conviction and death sentence in 1982. Jones v. State, 293 S.E.2d 708 (Ga. 1982) ("Jones I"). Jones filed a state habeas corpus petition, which the Superior Court of Butts County denied in 1982; the Georgia

4

Supreme Court affirmed that denial in 1984. The United States Supreme Court denied Jones's petition for a writ of certiorari. Jones v. Francis, 469 U.S. 873 (1984). Jones then petitioned for habeas relief in federal court. The United States District Court for the Northern District of Georgia granted the petition in part and ordered a new sentencing proceeding, on the ground that the state trial court had improperly allowed the jury to bring a Bible into the deliberation room. See Jones v. Kemp, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989).

Jones's second penalty-phase trial took place in the Superior Court of Cobb County in September 1997. During closing argument, the prosecutor commented:

> The thing that bothers me most about this case, and I hope it bothers you, is the complete lack of remorse. Have you seen any remorse in this case? I hope I'm wrong about it. I hope you saw some, because I didn't. None of the defense witnesses who testified told you anything about Jones being remorseful. Again, I hope I'm wrong. No one has claimed through Jones's lawyers or his writings that he has apologized to the Tackett family or sought their forgiveness. No one has claimed through Jones's web site on the Internet that he's apologized to the Tackett family or sought their forgiveness. Now, who has the power of forgiveness on this earth? Well, that belongs to Mr. Tackett, and in his absence, to Mrs. Tackett and her daughter, and there's no evidence that they have been asked. I find that . . . unusual for eighteen years he's had that opportunity. He's got all kinds of pen pals who apparently would do anything for him. I'm sure if asked, they would have been dispatched to Florida. But there's no indication or evidence that they were asked. So where is the remorse?
>
> Is not that the kind of conduct that deserves the death penalty?

5

The defense objected and requested a mistrial, arguing that the prosecutor's closing statement impermissibly commented on the defendant's refusal to testify. The state trial court denied the motion.

During deliberations, the jury informed the trial court that it had reached an "impasse," apparently because one juror was "opposed to the death penalty under any circumstances." See Jones II, 539 S.E.2d at 160. The judge then chose to give a so-called Romine charge.[1] A Romine charge is the Georgia state-law equivalent

---

[1] This was the charge:

> You have now been deliberating upon this case for a considerable period of time. The Court deems it proper to advise you further in regards to the desirability of agreement, if possible.
>
> The case has been exhaustively and carefully tried by both sides and has been submitted to you for your decision and verdict, if possible.
>
> While the verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinions of each other. A proper regard for the judgments of others will greatly aid us in forming our own judgment.
>
> Each juror should listen to the arguments of other jurors. If the members of the jury differ in their view of the evidence or the mitigating or the aggravating circumstances, such differences of opinion should cause them or cause you all to scrutinize the evidence more closely and to reexamine the grounds of your opinion. It is your duty to decide the issues which have been submitted to you if you can conscientiously do so.
>
> Do not hesitate to change an opinion if convinced it is wrong. However, you should never surrender honest convictions or opinions in order to be congenial or to reach a verdict solely because of the opinion of others.
>
> The aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

of a federal <u>Allen</u> charge, <u>see</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896); <u>Romine</u> <u>v. State</u>, 350 S.E.2d 446, 525-26 (Ga. 1986), where a trial judge urges a hung jury to continue deliberating and to attempt to reach a verdict. Three hours later, the jury returned a verdict: it found two statutory aggravating circumstances -- that Jones committed the murder while engaged in the commission of armed robbery and burglary, <u>see</u> Ga. Code Ann. § 17-10-30(b)(2), and that the murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," <u>see</u> <u>id.</u> § 17-10-30(b)(7) -- and sentenced Jones to death. <u>See</u> <u>Jones II</u>, 539 S.E.2d at 157.

Jones appealed to the Georgia Supreme Court. Among other points of error, Jones raised his Fifth Amendment challenge to the State's closing argument. The Georgia Supreme Court rejected this argument because "it is not improper to argue the defendant's lack of remorse in the penalty phase, nor do such comments amount to an improper reference to a defendant's failure to testify." <u>Id.</u> at 159. According to the state's high court, the prosecutor was not pointing at Jones's failure to testify but rather the fact that "[s]everal of Jones's mitigation witnesses testified about his numerous articles . . . and their frequent correspondence with him, but . . . none had mentioned any expression of remorse by Jones." <u>Id.</u>

---

Now, in just a moment I'm going to send you back to the jury room so that you may again continue your deliberations for a reasonable period of time and examine your differences in a spirit of fairness and candor and try to arrive at a verdict in this case.

7

C.

Jones then collaterally attacked his death sentence by filing a habeas petition in the Superior Court for Butts County in 2003. In 2004, the state habeas court held an extensive evidentiary hearing on Jones's claims of ineffective assistance of trial counsel, and developed an elaborate record of what Jones's trial counsel had and had not done in preparation for the penalty phase.

Through this record, we learned that Jones's trial counsel, Clive Stafford Smith, had hired an investigator, Bart Stapert, who started compiling evidence of Jones's childhood and background for potential use at sentencing. Stapert made two trips to Chicago in 1993 and found witnesses who could testify about Jones; in the same year, however, Smith relocated and ended his representation of Jones, which also ended Stapert's involvement in the case.

The case did not move forward for several years, until the state court appointed two new lawyers, Ray Gary, Jr., and J. Michael Treadaway, to represent Jones in March 1996. A third lawyer, Tony Axam, joined the team shortly before the penalty phase retrial and was the one who actually conducted the retrial.

After Gary and Treadaway first met Jones, Jones sent his new attorneys a letter, along with twenty-seven attachments (mostly Jones's own publications or writings). These writings described how an older female cousin had sexually abused Jones when he was five years old, and how Jones had suffered "extremely

8

violent beatings" from his uncle. The writings also detailed that when Jones fled

home, he became a member of a gang, which led to his incarceration at Sheridan, a

juvenile detention center where he was beaten. Both defense counsel Gary and

Treadaway testified that they had read Jones's letter and remembered parts of the

personal history contained in the attached articles. They also testified, however,

that when they asked Jones about the writings, Jones said something to the effect

that, "I tell them what I think they want to hear." Gary took this to mean that the

writings were "fiction" and "[not] true," and Treadaway took it to mean that the

writings were "not to be relied upon." In addition, both attorneys testified that they

would have inquired about abuse when asking general background questions, but

they could not remember Jones telling them, in person, that he had ever been

abused as a child.[2]

---

[2]    Specifically, Gary testified this way:

[The State]: . . . . What kind of questions did you ask Petitioner about his childhood?

[Gary]: We asked him, you know, like where he went to school, if he had been trouble. We asked him about his medical history and school history and discipline history, about his parents and how he was raised, whether or not there was any abuse.

Q: Do you recall what he said to you about that?

A: I don't remember him saying that there was any.

Q: You don't recall him saying there was any abuse by his parents?

A: No.

Q: Do you recall him saying there was any abuse from anyone else who reared him?

In December 1996, the defense team received a letter from Stapert, the investigator hired by Jones's previous attorney. Stapert's letter said that he had "spent a lot of time with [Jones] and developed a close relationship with him," and had "built good contacts with several of [Jones's] friends and family members in the Chicago area." Stapert claimed to have "created a fairly detailed picture of what evidence could and should be presented at trial," and offered "to assist you in your efforts or, at the least, share any insights and information I might have." However, it appears that none of Jones's three lawyers contacted Stapert during their investigation in preparation for Jones's retrial.

Instead, Gary and Treadaway testified that they reviewed the boxes containing Jones's previous attorneys' files, though Axam, who officially joined the team shortly before the retrial, did not have time to review all of the material. Included in the records was a 1963 report by U.S. Army psychiatrist Dr. Levon D. Tashjian, which recommended, and ultimately led to Jones's discharge from the army for psychological reasons. Dr. Tashjian observed that Jones "was markedly depressed," and he initially placed Jones on anti-depressant medications. Tashjian

---

A: No, but that is what we were looking for, obviously.

Q: So you were asking about specific questions about that topic?

A: Yes. That's what we were there for. That was the main thing we would be looking for is any mitigation for the penalty phase.

10

concluded that there was no evidence "of a major thinking disorder such as specific psychosis or psychoneurosis," but that Jones suffered from "a severe character disorder, characterized by extreme emotional instability and liability, by immaturity in handling the demands of his environment, . . . and by his passive way of running away from the stresses of his environment." Tashjian believed that Jones's poor adjustment to the military was the consequence of his character disorder and merely "a repetition of a demonstrable life-long pattern of defective adjustment." The doctor ultimately concluded that attempts at rehabilitation would have been unavailing. He did note, however, that Jones "was and is mentally responsible, both to distinguish right from wrong and to adhere to the right."

While defense counsel Treadaway did not remember Tashjian's report, Gary testified that the report contained "90 percent aggravation and 10 percent mitigation" and was "certainly not anything [he] would want to bring in front of a Cobb County jury." Gary admitted that the defense team never followed up or investigated the report.

Treadaway also testified that he subpoenaed Jones's prison records but that he did not recall whether any mental health evaluations were included. In fact, Jones's prison medical records contained three mental health evaluations by prison psychiatrists. The first, dated July 13, 1982, concluded that "this patient has no evidence of psychiatric illness." The second, dated February 16, 1987, by

11

psychiatrist Dr. Marcelo de la Serna, likewise concluded that Jones "was not suffering from any severe clinical symptomatology," but also opined that Jones "presented a picture of a deeply ingrained and pervasive personality disorder." Dr. de la Serna thus determined that while Jones was not suffering from an Axis I clinical disorder (such as bipolar disorder or PTSD), he did suffer from an Axis II personality disorder -- to wit, mixed personality disorder with "prominent histrionic, paranoid, and passive-aggressive features."[3] The final report, dated December 1, 1987, concerned Jones's reports of difficulty sleeping. The report stated that Jones was given Benadryl and would continue to be monitored.

Both Gary and Treadaway testified that they could have secured the funds for an investigator or a mental health expert from the state court. They did not petition the court for such funds, however, because they believed that hiring a mental health expert potentially would have hurt the defense. According to Gary, the law at the time of Jones's retrial would have permitted the State to interview the mental health expert and even to call that expert as a State's witness. Nor did they hire an investigator to look into Jones's childhood.

Instead, Gary and Treadaway focused on three other avenues of mitigation, which they investigated and which Axam eventually presented to the jury. First,

---

[3] The Diagnostic and Statistical Manual of Mental Disorders ("DSM") organizes psychiatric diagnoses into several dimensions or axes: Axis I pertains to all psychological diagnostic categories except mental retardation and personality disorders, and Axis II pertains to mental retardation and personality disorders. See, e.g., Am. Psychiatric Ass'n, DSM (3d ed. 1980).

12

counsel believed that the evidence of the crime itself left open the possibility that Solomon, Jones's co-defendant, had killed the victim, and that Jones was not the shooter. The attorneys hired a forensic expert, Dr. Norton, to examine the facts and testify at the retrial that based on the angles of the bullet holes, Jones could not have been the shooter. Second, Gary and Treadaway attempted to blunt the State's introduction of the petitioner's prior Illinois assault conviction as an aggravating circumstance. To that end, they hired an investigator to go to Chicago and find a witness who would testify that the assault victim was actually the aggressor, and the witness testified at trial. Finally, Gary and Treadaway sought to demonstrate that Jones had forged valuable relationships with pen pals while he was in prison, and that Jones's death would hurt his family. Thus, they interviewed several family members and Jones's pen pals, some of whom eventually testified on Jones's behalf.

At some point during the second trial, either Jones himself or his supporters apparently told Axam about the abuse and neglect that Jones suffered as a child. Axam therefore prepared a proposed jury instruction that listed three specific mitigating factors that the jury could find about Jones's difficult childhood. Axam had no witnesses or evidence to attest to these mitigating circumstances, however, so the trial court declined to give the proposed instruction.

13

Beyond this account by Jones's trial attorneys of the circumstances surrounding the sentencing retrial, the record from the state habeas hearing contains three other broad categories of relevant evidence: (1) additional background mitigation evidence regarding Jones's childhood; (2) background aggravating evidence regarding Jones's mistreatment of his family and other misconduct; and (3) mental health mitigation evidence. In particular, Jones offered eight affidavits from friends and family members who knew Jones while he was growing up, as well as affidavits and depositions from four mental health experts. For its part, the State offered the contents of the file compiled by the investigator, Bart Stapert, for Jones's prior counsel, Clive Stafford Smith (the "Stapert file"). The State also introduced Jones's prison record, military record, and arrest record.

Together, the evidence presented to the state habeas court reveals an unhappy and abusive childhood. Jones's mother, Jessie Carter, evinced signs of mental instability, his father played no role in his upbringing, and his family was poor. Jones gave Carter "fits" because he was "not a quiet baby," and when Jones was a toddler, Carter gave him to her aunt and uncle, Lois and Reverend James McGee, who then raised him. McGee, Jones's uncle, regularly beat Jones and his cousin, Lois Crenshaw. A neighbor and friend of Jones, Odell Duncan, recalled that Jones's "arms and face were always covered in bruises."

14

Jones repeatedly ran away from the McGees's farm until, at the age of twelve, he moved back in with his mother and her new husband, Julius Lewis, in Chicago. Carter was ill-equipped to raise a child, and her marriage was a violent one. During this time, Jones developed an extensive juvenile record "for stealing cars and the like" and began using aliases. At around thirteen years old, he was placed -- under the name "Estes Lewis" -- in the State Industrial School for Boys in St. Charles for robbing a milkman. As a fifteen year old, Jones was sent to Sheridan, a state juvenile institution that resembled a prison, for eighteen months. Jones told the investigator, Stapert, that he went to Sheridan for "an incident related to the murder of a youth at a gang party"; Jones's father, however, claimed that Jones had raped a girl who lived down the street from his grandmother. While Jones was at Sheridan, the guards and administration were abusive to the children in their custody and were, in the words of one affiant, "vicious racists." In 1960, the year after Jones was released, the Illinois legislature investigated allegations of brutality at Sheridan. In 1973, following a consent judgment entered in a lawsuit by Sheridan residents, the facility ceased operating as a juvenile institution entirely.

His life as an adult did not improve much. Jones entered the army at nineteen, but he was discharged for "unsuitability" a little more than a year later. Jones's military records included a statement from his company commander,

Charles Pardee, which criticized Jones's army performance. Specifically, it provided that Jones had "contributed nothing" to the army, that he had "absented himself" from the army on numerous occasions, and that he had "no regard for the military or its regulations," "cannot accept responsibility," and "in general is very bad for the morale of this unit."

The sworn affidavit of Ruby McDougle, Jones's first wife, explains that Jones was "not a good husband" and was "too unstable." His daughters, Lisa and Veronica, told Stapert that Jones had physically abused their mother, Ruby, while they were growing up, and that he was not around very much. His second wife, Yvonne Crosswell, revealed to Stapert that Jones had beaten her at least once a week, even when she was pregnant. She said that he once kidnapped their children, and she eventually left him because he beat the children.

Several relatives and friends also reported, in affidavits and conversations with investigators, that Jones had often been in jail. Yvonne said that whenever Jones was arrested, he would bail out and avoid recapture by relying on different aliases. In fact, Jones told Stapert's investigators that his aliases included Willie Hooper, Astor Jones, Brandon Jones, Estes Lewis, Hambert Lewis, Wilbur May, Jimmy McGee, Estes McGee and James McKay, and that his priors could "appear in Chicago area; Denver; Jefferson County, Mo.; Los Angeles; Washington, DC; and Gary, Indiana." Jones confirmed to those investigators that he "sometimes

16

would get charged with something, make bond, change his name and never show up again." Besides his strong arm robbery conviction discussed at sentencing, Jones was also convicted of contributing to the delinquency of a minor. His prison records also describe over two dozen infractions for which Jones was disciplined while incarcerated: among other infractions, Jones fashioned weapons by melting razor blades onto ink pens, threw hot water and baby oil at a guard, and broke a prison window by repeatedly hurling a typewriter at the glass.

Further, Yvonne, friend Orteal Tyler, and daughter Lisa revealed to investigators that Jones made a living "hustling" as a pimp. Jones himself admitted to those investigators that he ran "tourist houses" in Washington, D.C., and Chicago, which were actually fronts for brothels where drugs and prostitution were intertwined. Orteal didn't remember Jones ever holding down a steady job; instead, he made his money by pimping.

As for his mental health evidence, Jones presented to the state habeas court affidavits or deposition testimony from four psychiatric experts. Jones's experts diagnosed him with PTSD, bipolar disorder, and decreased brain functioning.

Dr. Marlyne Israelian, a clinical psychologist specializing in psychotherapy and neuropsychological evaluation, performed a series of neuropsychological tests on Jones. Dr. Israelian opined, based on the test results and affidavits from his friends and family, that Jones exhibited a lifelong pattern of behavior consistent

with childhood-onset bipolar disorder. Israelian also stated that Jones's results were consistent with a diagnosis of PTSD, and that Jones's history of physical, sexual, and emotional trauma and exposure to the chemical perchloroethylene contributed to deficient brain functioning. Unlike Dr. de la Serna, who had examined Jones in prison in 1987 and considered him alert and intelligent, Israelian found that Jones suffered from cognitive deficits. She opined that these deficits -- particularly his poor judgment, lack of impulse control, and inability to process new information -- contributed to his participation in the murder.

Dr. Elaine Walker, a clinical psychologist specializing in mental disorders, reviewed the same materials as Israelian. She canvassed the environmental risk factors in Jones's history -- particularly the abuse he suffered as a child, and his exposure to chemicals such as perchloroethylene through his work as a dry cleaner -- and concluded that Jones met the clinical criteria for a life-time diagnosis of bipolar disorder and PTSD. Dr. Pablo Stewart, a psychiatrist, conducted a clinical interview with Jones and reviewed the documentary evidence, along with the reports submitted by Walker and Israelian. Dr. Stewart too diagnosed Jones with PTSD, Bipolar I Disorder, and related cognitive impairments. Furthermore, Stewart concluded that Jones's mental impairments significantly contributed to the offense for which he was convicted. Finally, Dr. Tashjian, the army psychiatrist

who evaluated Jones in 1963, explained that his 1963 findings were consistent with the contemporary diagnoses of PTSD and bipolar disorder.

## D.

In 2006, the state habeas court denied all of Jones's claims for relief in an order adopted verbatim from the State's proposed order.  Citing to Strickland, 466 U.S. 668, the state court determined both that Jones's attorneys performed effectively in their investigation of mitigating evidence, and that the failure to uncover evidence of Jones's childhood abuse and mental health problems caused Jones no prejudice.

As for performance, the state court credited Gary and Treadaway's testimony that they specifically had asked Jones about abuse.  The court also found that, when Gary and Treadaway asked Jones about his autobiographical articles containing allegations of physical and sexual abuse, Jones replied that he was simply telling the readers what they wanted to hear.  Concerning Dr. Tashjian's 1963 report, the state court credited Gary and Treadaway's testimony that they believed the report's diagnosis would be more aggravating than mitigating.

As for the prejudice prong of Strickland, the state court discounted Jones's autobiographical allegations of sexual and physical abuse.  The state court also found that the mental health experts' diagnoses of Jones were "the product of unsupported evidence and errant analysis."  The state court noted that Dr. Stewart

"completely disregarded" the diagnoses of the psychiatrists who had evaluated Jones in prison, and that the facts upon which Dr. Stewart relied were "fraught with speculation, error, clear bias, and do not present an accurate report of Petitioner's life."

The state court also observed that Dr. Israelian had concluded that Jones's exposure to perchloroethylene had contributed to his mental deficiencies -- even though the record provided little basis for one to discern the extent of his exposure or even how long Jones had worked as a dry cleaner. The state court further determined that Jones's statement, given to police on the night of the crime, strongly suggested that Jones was not an inactive or unwitting participant in the murder -- which directly contradicted Dr. Israelian's opinion that Jones's disorders made him vulnerable to manipulation by co-defendant Solomon.

Finally, the state court determined that Dr. Tashjian's findings, based only on his evaluation in 1963 and not on any new information about Jones, were the product of "blatant speculation" and that Dr. Tashjian was "reaching to find any corollary between his 1963 report and Petitioner's current diagnosis." The court did not address Dr. Walker's affidavit separately, but it nevertheless reached the overarching conclusion that Jones had not been prejudiced because "the foundation upon which Petitioner's alleged mental health experts rely is patently biased and incorrect." The state habeas court therefore denied Jones's <u>Strickland</u> claim.

20

E.

In September 2008, the Georgia Supreme Court denied Jones's application for a certificate of probable cause to appeal.[4] In 2009, Jones filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254. On August 10, 2011, the United States District Court for the Northern District of Georgia denied the petition in its entirety. The district court rejected Jones's ineffectiveness claim, concluding that the state court had reasonably applied Strickland when it held that Jones had not been prejudiced by counsel's failure to investigate or offer the additional mitigating evidence. The district court also rejected Jones's Fifth Amendment claim because it read the prosecutor's comments not as an impermissible allusion to Jones's failure to testify but rather as a permissible "observation that despite the numerous mitigation witnesses the petitioner presented to speak to his good character, none provided any testimony that the petitioner expressed remorse." The district court granted Jones a COA on those two claims: (1) whether counsel provided ineffective assistance during Jones's sentencing retrial; and (2) whether the State's closing argument violated Jones's Fifth Amendment privilege against self-incrimination. We denied Jones's motion to expand his COA.

II.

---

[4] Since the Georgia Supreme Court declined to review the merits of the case, the Superior Court's denial of habeas relief is the final state-court determination of Jones's Strickland claim. See Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008).

21

We review <u>de novo</u> the district court's denial of habeas relief pursuant to 28 U.S.C. § 2254. <u>Wellons v. Warden</u>, 695 F.3d 1202, 1206 (11th Cir. 2012). The district court's legal conclusions, and its resolution of mixed questions of law and fact, also receive <u>de novo</u> review. <u>Id.</u>

Since Jones's habeas petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, these provisions govern his challenge:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1)'s "contrary to" clause, we grant relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, we grant relief only "if the state court identifies the correct governing legal principle

22

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. We may overturn factual findings by the state habeas court only when a petitioner produces "clear and convincing evidence" that those findings are erroneous. 28 U.S.C. § 2254(e)(1). The Supreme Court has stressed that "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).

As an initial matter, Jones argues that we should not apply AEDPA deference to the state habeas court's order because it was adopted verbatim from the State's proposed order.[5] We are unpersuaded.

AEDPA mandates deferential review of any claim that a state court "adjudicated on the merits," 28 U.S.C. § 2254(d), and does not impose any specific requirements on how a state court should announce its decision. Jones does not

---

[5] Jones suggests, at one point, that the adoption of the State's proposed order also violated his due process rights. It is unclear from the briefs to what extent this argument is separate and distinct from the petitioner's claim that the habeas court's order does not merit AEDPA deference. To the extent this is a distinct substantive claim, we decline to consider it because we do not review arguments not included in the COA. Williams v. Allen, 598 F.3d 778, 795 (11th Cir. 2010); Murray v. United States, 145 F.3d 1249, 1250-51 (11th Cir. 1998) (per curiam). The district court granted Jones a COA with respect to only his Strickland claim and his Fifth Amendment claim regarding the prosecutor's closing argument. We subsequently declined to expand the COA. Moreover, even if Jones had raised this claim as part of his motion to expand the COA, this claim does not warrant a COA. See Rhode v. Hall, 582 F.3d 1273, 1281 n.4 (11th Cir. 2009).

23

and cannot deny that his claims were adjudicated on the merits; the state court's order undeniably rejected Jones's Strickland claim on the merits, not on any procedural ground. Indeed, the state court's order extensively analyzed his Strickland claim over the course of ninety pages. Considering that a summary disposition of a Strickland claim qualifies as an adjudication on the merits, see Ferrell v. Hall, 640 F.3d 1199, 1224 (11th Cir. 2011); Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), we can discern no basis for saying that a state court's fuller explanation of its reasons -- albeit reasons drafted for the court by the State -- is not entitled to AEDPA deference.

Moreover, we have considered and rejected similar arguments in the past. In Rhode v. Hall, for example, a habeas petitioner challenging his death sentence argued that the state court's habeas decision was not entitled to deference. See 582 F.3d 1273, 1281 (11th Cir. 2009). Like Jones, Rhode "complain[ed] that the state habeas court adopted verbatim the State's proposed order," and that the order "uncritically incorporate[d]" the State's evidence and "mischaracterizations of the evidentiary record." Id. Thus, by Rhode's lights, the order was not "a fair and impartial assessment of the facts and law," and its findings should have been rejected as unreasonable determinations of fact pursuant to § 2254(d)(2) and (e)(1). Id. A panel of this Court in Rhode rejected that claim, noting that "the record clearly reflects that both Rhode and the State had the opportunity to present the

24

state habeas court with their version of the facts," and concluding that, "[d]espite the fact that the state habeas court adopted the State's facts verbatim, these findings of fact are still entitled to deference from this court." Id. at 1282.

Jones cites as primary support for his position Jefferson v. Upton, 560 U.S. 284 (2010). In Jefferson, the Supreme Court applied the pre-AEDPA version of § 2254 and held that a state court had denied a death-penalty petitioner a full, fair, and adequate hearing, where: (1) the state court had adopted factual findings drafted exclusively by the State's attorneys pursuant to an ex parte request from the state-court judge; (2) the state court had failed to notify the petitioner of the request made to opposing counsel; and (3) the proposed findings recounted evidence from a nonexistent witness. See 560 U.S. at 292. Jefferson offers no guidance here, however, because it is both legally and factually distinguishable.

First, Jefferson never could have held, nor did it presume to hold, that this kind of adopted order is not entitled to AEDPA deference. Jefferson addressed a claim arising under the pre-AEDPA version of § 2254; the Jefferson Court was therefore operating under a different statute than the one controlling this case. Moreover, even absent that legal distinction, the facts of this case are critically different from Jefferson. There, the state court adopted a proposed order that it had obtained ex parte from the State, without notice to Jefferson. Here, notably, the state court requested that both Jones and the State prepare proposed orders. The

court conducted an evidentiary hearing in August and September 2004, at which Jones was represented ably by his habeas counsel, who presented several witnesses and 125 exhibits spanning about 5,000 pages. The state court then took a year and a half to consider the party's submissions and only issued its order denying habeas relief in March 2006. In stark contrast to Jefferson, the circumstances here demonstrate that Jones received a full and fair hearing on all of his habeas claims.

## III.

Jones's primary claim on appeal is that the state court unreasonably applied Strickland when it concluded, first, that his trial counsel's investigation of mitigating evidence was not deficient and, second, that there was no reasonable probability that the additional mitigating evidence discovered by Jones's habeas counsel would have altered the outcome of his trial. To prevail under Strickland and AEDPA, Jones first has to demonstrate that every fairminded jurist would conclude that counsel's performance was so deficient that it "fell below an objective standard of reasonableness," 466 U.S. at 688. The Strickland inquiry is "highly deferential" and evaluates "all the circumstances . . . . from counsel's perspective at the time." Id. at 688-89.

Then, to meet his burden on Strickland's second prong under AEDPA, Jones also has to show that every fairminded jurist would conclude "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

26

proceeding would have been different." Id. at 694. Jones need not show that

counsel's conduct more likely than not altered the outcome of his penalty

proceeding; "[a] reasonable probability is a probability sufficient to undermine

confidence in the outcome." Id.; see Brownlee v. Haley, 306 F.3d 1043, 1069

(11th Cir. 2002); Mincey v. Head, 206 F.3d 1106, 1143 (11th Cir. 2000). When, as

here, the claim concerns the failure to present mitigating evidence, "we reweigh

the evidence in aggravation against the totality of available mitigating evidence" to

determine whether the petitioner suffered prejudice. Wiggins v. Smith, 539 U.S.

510, 534 (2003). "[W]hat matters is not merely the number of aggravating or

mitigating factors, but their weight." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d

1217, 1240-41 (11th Cir. 2010). In addition, since this case arises in Georgia,

where the death penalty requires a unanimous jury verdict, prejudice exists where

every fairminded jurist would perceive "a reasonable probability that at least one

juror would have struck a different balance." Wiggins, 539 U.S. at 537. Notably, a

court "may decline to reach the performance prong of the ineffective assistance test

if convinced that the prejudice prong cannot be satisfied." Waters v. Thomas, 46

F.3d 1506, 1510 (11th Cir. 1995) (citing Strickland, 466 U.S. at 697).

## A.

As an initial matter, we assume without deciding, for purposes of this

appeal, that the state habeas court unreasonably applied Strickland by finding that

27

Jones's counsel performed adequately in preparing for and presenting mitigating evidence at the penalty phase of trial. We ground this assumption on the fact that counsel became aware of several avenues of potential mitigating evidence to pursue -- through, for example, the defendant's own personal essays, a letter from previous counsel's investigator, and a mental health evaluation found in the defendant's military records -- yet counsel failed to follow up on any of these red flags. On the other hand, however, the state court found -- and there is evidence in the record to support the findings -- that Jones told his attorneys that some of the stories in his writings were fabricated, and that Jones never told his attorneys about his childhood abuse, even though they had questioned him about it. On this mixed record, we need not resolve the question of whether the performance of Jones's counsel was deficient, let alone whether the state habeas court's determination of adequate performance was an unreasonable application of Strickland. As we determine below, Jones has failed to establish that the state habeas court's Strickland prejudice determination was an unreasonable one. See Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) ("We need not determine whether counsel's limited investigation into Windom's background and mental health constituted deficient performance under the first prong of Strickland because we conclude that, even assuming counsel performed deficiently, Windom was not prejudiced thereby."); Hall v. Head, 310 F.3d 683, 699 (11th Cir. 2002)

("[A]lthough there is evidence in the record to support the district court's finding of deficient performance, we need not and do not 'reach the performance prong of the ineffective assistance test [because we are] convinced that the prejudice prong cannot be satisfied.'" (quoting Strickland, 466 U.S. at 693)).

## B.

We turn then to prejudice and weigh the totality of the aggravating evidence against the totality of the mitigating evidence, both what was presented at Jones's trial and what was discovered for his state habeas proceeding. Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000). On the totality of this evidence, we conclude that the state court's determination that Jones did not raise a reasonable probability of a different result is not contrary to or an unreasonable application of Strickland.

To begin with, we do not dispute that some of Jones's proffered mitigating evidence, both about his childhood and his mental health, could have been helpful to his arguments at sentencing. Indeed, evidence of Jones's psychiatric problems may have bolstered the argument that Solomon, not Jones, was the driving force behind the decision to rob the store. Further, the details regarding Jones's childhood with his abusive uncle and sexually abusive cousin and at a deplorable juvenile detention center may have supported the argument that Jones was not fully culpable for his actions, and may have cast him in a more sympathetic light.

29

However, Jones's reliance on this "new" mitigating evidence suffers from several substantial flaws. First, by introducing this evidence, Jones's counsel would have opened the door to a vast array of aggravating evidence that likely would have overwhelmed the balance of mitigating evidence in this case. See Wong v. Belmontes, 558 U.S. 15, 26 (2009) (concluding that petitioner could not show prejudice since the proposed mitigating evidence would have opened the door to strong aggravating evidence); Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc) (same); Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1289 (11th Cir. 2013) (same); Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252, 1275 (11th Cir. 2012) (same); Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010) (same); Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1251 (11th Cir. 2009) (same); Wood v. Allen, 542 F.3d 1281, 1311-12 (11th Cir. 2008) (same); Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1004 (11th Cir. 2007) (same); Robinson v. Moore, 300 F.3d 1320, 1350 (11th Cir. 2002) (same). Second, the mitigating mental health evidence was largely rejected by the state habeas court, and was subject to serious attack and meaningful contradiction.

Some of the most damaging evidence in the full habeas record came from Jones's family and friends. His daughters, Lisa and Veronica, revealed that Jones had beaten their mother, Ruby, who admitted that Jones was "not a good husband,"

and "too unstable." His second wife, Yvonne, went even further in describing him as violent: she said Jones once beat a man with a hammer because he commented on Yvonne's outfit; Jones beat Yvonne at least once a week, even when she was pregnant, once with a 2x4 board until she passed out in the bath tub; Jones beat her children; Jones would make the children stand in the corner for hours and beat them if they moved; and Jones had the children watch while he beat her.

His military record likewise failed to cast him in a positive light. He was discharged from the army after about a year, and his company commander expressly said that Jones had "contributed nothing" to the army, that he had "absented himself" from the army on numerous occasions, and that he had "no regard for the military or its regulations," "cannot accept responsibility," and "in general is very bad for the morale of this unit." Plainly, this evidence would have undercut any plea for mercy that Jones would have sought to make on a fuller habeas record.

Nor would the portrait of Jones as being submissive to Solomon have been left untouched. Aside from the details about the physical abuse he unleashed on his family, much of the testimony would have painted Jones as a seasoned criminal who knew how to work the system. Yvonne, friend Orteal, and daughter Lisa disclosed Jones's career as a pimp, and Jones himself admitted that he ran "tourist houses" in D.C. and Chicago where "drugs and prostitution were intertwined."

31

Yvonne also explained that whenever Jones was arrested, he would bail out and disappear under one of the nine different aliases found in the habeas record.

The habeas record also includes damning evidence of the numerous and serious prison infractions Jones has committed since he has been on death row. One report detailed that Jones had hurled a typewriter repeatedly at a window until both the window and the typewriter had been broken. Another said that Jones had injured a prison guard by throwing hot water and baby oil on the guard's face and shoulder. In yet another, a guard found Jones in possession of two ink pens with razor blades melted onto them as weapons. There are also many reports detailing other instances of insubordination, including times he cursed at or threatened the guards or spat in their faces, as well as times he failed to follow instructions or possessed contraband.

The image of Jones found in the habeas record stands in stark contrast to the one counsel actually portrayed at sentencing. There, counsel relied on residual doubt, by using the evidence of the crime itself to suggest that Jones had not been the shooter and calling a witness from Jones's prior assault conviction to testify that the victim, and not Jones, had actually been the aggressor. Defense counsel also introduced the testimony of family and pen pals to demonstrate that Jones's death would devastate his family and that Jones had reached out and touched the

32

lives of others while incarcerated. Put simply, they sought to humanize him -- an effort that would have collided with a largely unforgiving record.

To the extent Jones now argues that the State <u>could not</u> have introduced any of the "new" aggravating evidence because it <u>did not</u> do so, we are unpersuaded. As Jones acknowledges, his counsel did not delve into his background, character, or mental health in the sentencing retrial. Presenting this kind of evidence would have sharply changed the landscape of the case, for both Jones and the State. The Supreme Court has clearly said that "the reviewing court must consider <u>all</u> the evidence -- the good and the bad -- when evaluating prejudice." <u>Wong</u>, 558 U.S. at 26 (emphasis added). And the permissible scope of the State's aggravating evidence depends in part on the kinds of mitigation the defense introduces. <u>See</u> <u>Wiggins</u>, 539 U.S. at 537 (noting that had Wiggins's counsel introduced the "powerful mitigating narrative" developed in the habeas proceeding, "Wiggins does not have a record of violent conduct that <u>could have been</u> introduced by the State to offset" it) (emphasis added)); <u>see also</u> <u>Puiatti</u>, 732 F.3d at 1290 (recognizing that the <u>Strickland</u> calculus includes "the aggravating circumstances actually found, or that <u>would be found on remand</u>" (emphasis added)).

Here, had Jones's counsel attempted to offer a more detailed presentation about his childhood and life history, it seems to us that there is "not just a reasonable probability, but a virtual certainty that [Jones's] 'good' mitigation

33

evidence would have led to the introduction of 'bad' evidence," too. Reed, 593 F.3d at 1246. Indeed, some of the very witnesses he proffered at the state habeas proceeding are also the source of some of the aggravating material we've described -- including his daughter Veronica, his friend Taylor, and his first wife, Ruby, all of whom the State could have used to paint Jones as a violent, manipulative criminal. What's more, further probing into Jones's background and mental health could have opened the door to a strong rebuttal by the State based not only on additional character witnesses, but also on Jones's extensive and damning record from prison and the military. See Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368-69 (11th Cir. 2009); see also Wong, 558 U.S. at 25 (recognizing that "heavyhanded," "more-evidence-is-better" attempt to portray defendant in positive light can invite strong negative evidence in rebuttal). Thus, we do not think the state habeas court reached a result that was contrary to or an unreasonable application of Strickland when it found it likely that the presentation of additional mitigating evidence would have dredged up substantial, additional aggravating evidence that would not have tipped the scales in Jones's favor.

We are also unpersuaded by Jones's argument that his trial counsel's failure to investigate and present mental health mitigation evidence undermined confidence in the outcome of the trial. Jones's habeas mental health experts claim that Jones suffers from PTSD, bipolar disorder, and brain dysfunction, and that

34

these disorders affected his behavior on the night of the murder. But as the record shows, the state court disbelieved much of the testimony from Jones's four mental health experts -- Dr. Israelian, Dr. Stewart, Dr. Tashjian, and Dr. Walker -- and we are hard-pressed to say that the state court was unreasonable in doing so.

For starters, the state court gave two reasons for discounting Dr. Israelian's diagnosis that Jones suffered from PTSD, bipolar disorder, and decreased right-hemispheric brain functioning. First, the state court found that there was insufficient evidence to support her opinion that Jones's work as a dry cleaner, and his exposure to the neurotoxic chemical perchloroethylene, contributed to his neuropsychological maladies. It thus found that "Dr. Israelian has proclaimed a professional opinion well outside her area of expertise and based on unsupported factual findings, rendering her entire opinion questionable." Specifically, Israelian's report provided that "[i]t appears that the deficits associated with Mr. Jones's Bipolar disorder, which manifested very early, were exacerbated by years of psychological, physical and sexual abuse, in addition to exposure to neurotoxic dry cleaning agents." However, Israelian admitted that she did not have any information about the length or intensity of his exposure while employed at a dry cleaners. Indeed, the record is barren on these points.

The state court was also unpersuaded by Israelian's explanation of the connection between Jones's mental health issues and his participation in the crime,

35

since Jones's own statements, taken directly after the crime by law enforcement officers, undermined her view of him as an unwitting participant in the homicide or merely a tool of co-defendant Solomon. On this issue, the state court found that "Dr. Israelian's diagnoses and conclusions regarding Petitioner's culpability of the crime are lacking in credibility." As his statement to the police revealed, Jones knew that he and Solomon were entering the convenience store with the intent to commit burglary or armed robbery; he was armed with a crowbar; he admitted that he and Solomon had cased the store for a period of time; and he instructed Solomon where to hide the vehicle during the commission of the crime.[6] Israelian

---

[6] Relevant portions of Jones's statement to the police include these:

> D [Police officer questioning Jones directly after the murder]: Alright, tell me what were you doing inside that store?
>
> M [Jones]: I wasn't, we wasn't gonna have to burglarize. We were thinking about burglarizing it until we got in there and saw the place was empty.
>
> ***
>
> M: When I saw the place was open like it was when he [Solomon] come back see, I just just told him, I said park the truck. I was talking about if he parked the truck in front of the place. If we saw, we saw a police officer go by, probably shoot if he was going the other way. I thought about you know, if the truck was parked in front of the place, never be able to explain this here. So, first we was gonna park over by some bulldozers over there. And then that was too far away and we had to start across the street then somebody went by. And anyway, I looked up in there and there was a little driveway right up into that little forest there. And that way we would be able to you know, load up with the beer and everything and take it straight out to the side of the place there, you know, come out the front that way without having to go out to the street.
>
> ***
>
> D: What did you think about the door being open and the car being parked in front?

was questioned at her deposition about whether Jones had admitted in his post-arrest statement that he told Solomon where to park, and she said, "Based on what I just read, it would appear that way; but based on the entire transcript and his entire interview, there is a great deal of disorder and chaos." She also steadfastly maintained that Jones's plan on the night of the murder was to buy marijuana.

---

M: Tell you the truth, I thought about [g]oing, is I got a little scared and what I was wanting to do, I was just gonna punch the cash register, stash the money and run...

\*\*\*

M: ...We had been looking at the place quite a while you see.

\*\*\*

D: ...I'm saying why did you decide that was the store to go into rather than the store down the road? Why that store?

M: It was the only one. Some people had just come out of there. They didn't, wait a minute. I didn't see the people go in there. When we come by there the people were coming out of there. Coming out of there. The gal had kinda blonde, not blonde but real real light hair.

D: Alright. What did they do?

M: They was coming out. That time we was passed the place. And coming back the second time that's when I jumped with the crowbar. I figured that the you know, the store, I figured they had closed the place up or something. That's when I jumped out with the crowbar. You know when I saw the place was open it scared me a little bit.

[D]: Did you think they had forgot to open, close and lock the doors?

M: Yea. I run back you know, over there by the bulldozers. As I was going by the bulldozer I saw the little cubby hole up in there and I told him he could park up in there and we wouldn't have to go across the street[.]

D: You told Van driving? Was he driving or were you driving?

M: He was driving. I think I better shut up. I see I'm in a first class mess here.

Relying largely on these two matters -- which went to the etiology of Israelian's diagnosis, and her account of the crime -- the state court found incredible Israelian's testimony. It also discounted the opinions of Jones's remaining three habeas experts, who reached opinions consistent with Dr. Israelian's. It is relatively easy, under Georgia law, for a factfinder to disregard an expert's opinion. See Reynolds Const. Co. v. Reynolds, 459 S.E.2d 612, 614 (Ga. App. 1995) ("'[Expert] testimony is not conclusive or controlling and is submitted for whatever the [factfinder] considers it to be worth." (alterations in original) (quoting Wilson v. Prof'l Ins. Corp., 261 S.E.2d 450, 451 (Ga. App. 1979)); Wilson, 261 S.E.2d at 451 ("The opinion of an expert witness is not conclusive upon the [factfinder]. Such testimony is intended to aid them in coming to a correct conclusion upon the subject; but the [factfinder] is not bound by such opinion, and can disregard it. The [factfinder] may deal with such testimony as [it] see[s] fit, giving credence to it or not, and [it] may do so without rhyme or reason." (internal quotation marks and citations omitted). What's more, we've accepted a state court's findings that an expert is not credible when that expert fails to seek out and consider "all possible evidence." Callahan v. Campbell, 427 F.3d 897, 936 n.27 (11th Cir. 2005). At all events, on the record, we cannot find unreasonable the state court's conclusion that the experts' opinions appear to ignore -- at least on

their face -- the admissions contained in Jones's police statement, and even more significantly, are strongly undercut by other evidence in the habeas record.

Thus, for example, Israelian opined that Jones's deficits had "a direct bearing on his involvement in, and culpability for, the murder of Mr. Tackett" and caused the events to "spiral[] out of control on the night of Mr. Tackett's murder." She said that Jones's "poor judgment and lack of impulse control involved him in a criminal excursion with a man he had only just met," and that with the "new feedback" of Solomon's ill intentions and "the presence of an employee at a business he believed would be empty . . . , Mr. Jones had substantial difficulty quickly processing the new information, shifting his cognitive set accordingly, redirecting his focus and devising a new strategy." She emphasized at the deposition that Jones has "deficits in goal-directed behavior, . . . doesn't perceive new information, doesn't process new information, doesn't incorporate, doesn't change plan according to new information."

However, it was not unreasonable for the state court to cast heavy doubt on the notion that Jones was unable to process new information. As we've discussed, Jones's post-arrest statement alone suggests that on the night of the murder, Jones was able to direct Solomon to park the car in a place that would make it easier and quicker to abscond with the stolen goods. Further, the habeas record contains other evidence that squarely contradicts Israelian's account of Jones's cognitive

39

deficiencies. In 1987, for example, a prison psychologist expressly noted that Jones appeared alert and intelligent. The habeas record also establishes Jones's tendency to use aliases whenever he was arrested, to skip out on bail, and to regularly change locations and jobs. He also became a prolific writer while in prison, and developed a group of pen pals who testified on his behalf at trial.

Nor was it unreasonable for the state court to cast some doubt on the opinion that Jones lacked the ability to control his impulses. As the post-arrest statement indicates, he and Solomon had the presence of mind to wait for the store to empty out before they went in, and, again, he came prepared with a crowbar. The habeas record further reveals that Jones had the control and wherewithal to own and operate brothels, fronting as "tourist houses" that provided prostitution and drugs in two different cities. In addition, his prison record detailed that he had carried out a plan to make weapons by melting down razor blades.

The state court also relied on the reports of the prison psychologists, found in the habeas record, to highlight concerns about the diagnoses of Jones's habeas experts. In 1982, Jones saw psychiatrist Dr. Mark Hutto because Jones felt he was being treated poorly by the prison guards. Dr. Hutto gathered a social history from Jones and concluded, "[a]side from the patient being a rather obnoxious and demanding personality who has no feeling for the inaccuracy and inefficiencies in a bureaucratic system, this patient has no evidence of psychiatric illness . . . [;]

40

there is no evidence that this patient's demands are motivated by psychotic processes and he is not at this time in need of psychiatric treatment." Jones was evaluated again in 1987, by psychologist Dr. Marcelo de la Serna, because Jones wanted to establish a "therapeutic" relationship. After speaking with Jones, Dr. de la Serna found that Jones "was alert, highly verbal, [and] intelligent," "was not satisfied with any of the answers provided by the examiner, and in a highly skillful manner . . . would phrase questions so as to elicit excessive attention to his present concerns." Dr. de la Serna also noted that Jones "seems to possess an irascible temperament, an edgy irritability, and a fractious and retaliatory disposition." Dr. de la Serna opined, however, that Jones "was not suffering from any severe clinical symptomology," such as a mood or anxiety disorder, but rather "presented a picture of a deeply ingrained and pervasive . . . [m]ixed personality disorder, with prominent histrionic, paranoid, and passive-aggressive features." Later in 1987, Jones met with psychiatrist Dr. Cassandra Newkirk about sleeping problems. Dr. Newkirk reiterated that previous evaluators had deemed Jones "very manipulative" and to have a mixed personality disorder. She did not otherwise diagnose him.

None of the prison doctors diagnosed Jones with any of the disorders found by Jones's habeas experts. While we recognize that the evaluations from the prison doctors did not appear to be based on neuropsychological testing or a full record of Jones's life history, we cannot deny that they were performed closer in

41

time to the murder, long before Jones had developed the habeas record. Nor can we engage in a battle of the experts at this stage of the case. We can conclude, however, that based on the full habeas record, including the reports filed by the prison psychologists, that the state court was not unreasonable in discounting, at least in some measure, the strength of Jones's mental health experts. We recognize, as the Fifth Circuit has, that a state habeas court is not necessarily responsible for resolving a dispute between the experts. See Pondexter v. Dretke, 346 F.3d 142, 150 n.11 (5th Cir. 2003). However, as the Fifth Circuit noted, a state habeas court reviewing an ineffectiveness claim like this one must "see what evidence might have been adduced and . . . gauge any prejudice resulting from trial counsel's failure to present it. [Thus, the state court's] rejection of the evidence is relevant because it casts doubt on its persuasiveness and hence its force before the jury." Id. (quoting Belyeu v. Scott, 67 F.3d 535, 542 (5th Cir. 1995)).

This is not a case like Porter v. McCollum, 558 U.S. 30 (2009), where the state postconviction trial court utterly disregarded Porter's mental health evidence in its discussion of nonstatutory mitigating evidence. Id. at 43 n.7. Here, the state habeas court clearly considered Jones's mental health evidence, identified real problems with this evidence, and concluded that it would not have changed the outcome of Jones's trial.

Nevertheless, Jones advances several reasons why some of the aggravating evidence developed in the habeas proceeding would not be admissible at a new sentencing trial. We remain unpersuaded.

At the outset, we observe that the state habeas court considered all of the aggravating evidence in its Strickland analysis, implicitly finding that this evidence would be admissible under Georgia law. In addition, it expressly found that "Petitioner's misconduct in prison . . . and his many prior criminal acts would be sufficiently reliable sources of information . . . for the State to rely upon in questioning Petitioner's character witnesses." Because state courts are the ultimate expositors of state law, we are bound by state-court determinations on state-law questions. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Mullaney v. Wilbur, 421 U.S. 684, 691 (1975) (observing that federal courts are bound by state-court constructions of state law "except in extreme circumstances" (citation omitted)); Cargill v. Turpin, 120 F.3d 1366, 1381 (11th Cir. 1997) ("We are not at liberty to challenge [a] state court determination of state law."). Put another way, "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992).

43

Thus, to the extent that Jones raises attorney work-product privilege or other state-law challenges to the introduction of this evidence, we need not address these claims further. But even if we did, "a habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel relevant to assessing the reasonableness of those decisions in the circumstances." Johnson v. Alabama, 256 F.3d 1156, 1179 (11th Cir. 2001). This principle applies in Georgia, where a party may waive work-product protection by providing documents to an adversary. See McKesson Corp. v. Green, 610 S.E.2d 54, 56 (Ga. 2005) ("[A corporation] waived work-product protection when it provided the audit documents to the SEC."); see also Wellstar Health Sys., Inc. v. Jordan, 743 S.E.2d 375, 380 (Ga. 2013) ("A party may waive work product protection."). Applying the federal work-product rule, the Supreme Court has concluded that a defendant,

> by electing to present the [defense] investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

United States v. Nobles, 422 U.S. 225, 239-40 (1975) (footnote omitted). Here, by bringing this habeas action first in state court, and then again in federal district court, Jones has waived any current or future privilege or work-product protection

over the Stapert file. We do not see how the petitioner could use the contents of the Stapert file offensively to establish a <u>Strickland</u> violation and then turn around and block the contents of the very same file to the extent it contained -- as it did -- many aggravating circumstances too.

As for any federal constitutional hearsay claim Jones raises, we've recently rejected a similar argument in a death penalty habeas case. In <u>Muhammad v. Sec'y, Fla. Dep't of Corr.</u>, 733 F.3d 1065, 1073 (11th Cir. 2013), we relied on <u>Williams v. New York</u>, 337 U.S. 241 (1949), to hold that "hearsay is admissible at capital sentencing hearings." We noted that while "a defendant does not have a right to confront hearsay declarants at a capital sentencing hearing, . . . he does have a right to rebut information relevant to his character and record that is admitted against him at the sentencing hearing." <u>Id.</u> at 1074. We explained that "[a]lthough the law of capital sentencing has changed in some respects since <u>Williams</u>, the Supreme Court of the United States has never questioned [its] precise holding." <u>Id.</u> at 1074 (internal quotation marks and citation omitted). Because a state habeas court's interpretation of the federal Constitution is constrained only by clearly established <u>Supreme Court</u> law (i.e., <u>Williams</u>), we cannot find unreasonable the state court's determination that the contents of the

45

Stapert file was admissible hearsay.[7] This is especially true since Jones has given us no reason to believe that he was denied access to the witness interviews, prison disciplinary and mental health reports, or military records in the Stapert file; that he would not have the opportunity to cross-examine Stapert or even family and friends who were interviewed by Stapert (many of whom Jones himself relies on in this proceeding); or that he could not call his own witnesses.

Jones also says that the aggravating information found in the Stapert file and other records is not sufficiently reliable to be admissible. We've said that in considering whether to admit prior bad act evidence at capital sentencing, "the relevant inquiry for information at sentencing is whether it is reliable." Tucker v. Kemp, 762 F.2d 1480, 1487 (11th Cir. 1985) (en banc), vacated, 474 U.S. 1001 (1985), reinstated, 802 F.2d 1293 (11th Cir. 1986), cert. denied, 480 U.S. 911 (1987). Although we haven't defined "reliable" in this context, we know that prior convictions are admissible. See Zant v. Stephens, 462 U.S. 862, 873 (1983); Zant

---

[7] As the Supreme Court has said, the phrase "'clearly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. As a result, any relevant case law we've developed -- including, e.g., our decision in Proffitt v. Wainwright, 685 F.2d 1227, 1254 (11th Cir. 1982), that a capital defendant "ha[s] a constitutional right to cross-examine" a mental health expert at sentencing "before the doctor's report c[an] be used in determining sentence" -- does not apply to the state court decision here. Indeed, "[a] circuit court may . . . look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent. However, circuit precedent may not be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." Downs v. Sec'y, Fla. Dep't of Corr., 738 F.3d 240, 256-57 (11th Cir. 2013) (alteration in original) (internal quotation marks and citation omitted).

46

v. Stephens, 297 S.E.2d 1, 2-4 (Ga. 1982). We've also found that a defendant's commission of a prior, unadjudicated crime of forcible rape (unlike statutory rape) would be admissible during capital sentencing based on a rape victim's testimony. Devier v. Zant, 3 F.3d 1445, 1464-65 (11th Cir. 1993). Thus, we have no basis to find unreasonable the state court's conclusion that Jones's prior convictions for strong arm robbery and contributing to the delinquency of a minor, his repeated physical abuse of his family (through testimony from these very people), and his prior criminal conduct and use of aliases (again also drawn from the testimony of family members and friends) would be sufficiently reliable sources of information for the state to rely upon in rebutting Jones's character evidence.

Nor can we find unreasonable the state habeas court's conclusion that his military records, which document at length his misconduct while in the army, and his prison records, which document his serious misconduct while on death row, would also be admissible. See Pooler, 702 F.3d at 1276 (considering in aggravation military records showing that "Pooler was frequently disciplined for offenses, mostly absences without leave, and was found guilty in a court-martial for using disrespectful language to a superior officer and for refusing to obey orders and suffered a reduction in rank"); Cummings, 588 F.3d at 1369 (considering as aggravation "the evidence from Cummings's North Carolina prison file of Cummings's repeated involvement in violent incidents while in prison").

But even if we could say it was unreasonable for the state court to conclude

that this evidence was admissible substantively -- and on this record we cannot -- it

is undeniable that a party may impeach an expert witness with materials the expert

relied upon in reaching his opinion, or with materials that draw his very opinion

into question.  See Orkin Exterminating Co. v. McIntosh, 452 S.E.2d 159, 165 (Ga.

Ct. App. 1994) ("[W]hether [an expert's opinion] is based upon hearsay goes to the

weight and credibility of the testimony, not its admissibility."); Ga. Code Ann. §

17-16-4(b)(2) ("The defendant shall . . . permit the prosecuting attorney . . . to

inspect and copy or photograph a report of any physical or mental examinations

and of scientific tests or experiments, including a summary of the basis for the

expert opinion rendered in the report, or copies thereof, if the defendant intends to

introduce in evidence in the defense's case-in-chief or rebuttal the results of the

physical or mental examination or scientific test or experiment."); id. § 24-7-705

(eff. Jan. 1, 2013) ("An expert may testify in terms of opinion or inference and

give reasons therefor without first testifying to the underlying facts or data, unless

the court requires otherwise.  An expert may in any event be required to disclose

the underlying facts or data on cross-examination.").

Jones's habeas experts reviewed and referenced, among other things, his

military record, his prison psychiatric reports, and his family's statements, and the

experts opined at length about the consequences of Jones's childhood.  Thus,

during sentencing, the state would have been entitled to confront and cross-examine the petitioner's mental health experts as to the military and prison documents, both because those documents formed a basis of the experts' reports and because they cast real doubt on the experts' diagnoses. The state would also have been able to use the prior bad act evidence to impeach Jones's experts about his inability to plan, process information, and control his impulses: Jones was sufficiently competent to run houses of prostitution, to fashion makeshift weapons in prison, to use numerous aliases, and to change his name whenever he was arrested to avoid apprehension. In fact, Jones has failed to point us to any particular aggravating circumstances that could not have been used for impeachment purposes. Nor has Jones cast any real doubt on the reliability of the prison records, the accounting given by his daughter, his second wife or his friend Orteal, or his own admissions to investigators about his prior bad acts.

In short, we are left with a state habeas record that contains some mitigating background evidence from the retrial, new mitigating background evidence accompanied by a host of new and quite substantial aggravating evidence, and new mental health evidence that carried little weight for the state habeas court. Having thoroughly considered the totality of this evidence, the new and the old, the good and the bad, we cannot say that the state court's determination about Strickland

prejudice was contrary to or an unreasonable application of clearly established Supreme Court law.

## IV.

Jones also says that the prosecutor's closing argument violated his Fifth Amendment privilege against self-incrimination, and that the state habeas court's conclusion to the contrary was an unreasonable application of Griffin v. California, 380 U.S. 609 (1965). We reject this argument because the prosecutor's closing argument was not a commentary on Jones's failure to testify at trial.

A prosecutor's statement violates the defendant's right to remain silent if "the statement was manifestly intended to be a comment on the defendant's failure to testify" or "the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Knowles, 66 F.3d 1146, 1162-63 (11th Cir. 1995) (internal quotation marks omitted). In this case, neither was the prosecutor's closing argument manifestly intended to comment on Jones's failure to testify, nor would the jury necessarily and naturally have taken his remarks to be a comment on Jones's failure to testify. The prosecutor asked the jury, "Have you seen any remorse in this case?" That statement did not directly criticize Jones's refusal to testify to his remorse. At most, the prosecutor drew the jury's attention to the lack of remorse that Jones had expressed to his pen pals and confidants. Indeed, the prosecutor

expressly pointed out, "None of the defense witnesses who testified told you anything about Jones being remorseful." Thus, the most natural reading of the prosecutor's rhetorical question -- "Is not that the kind of conduct that deserves the death penalty?" -- is that the "conduct" in question was Jones's failure to express remorse to his pen pals and to the victim's family. Cf. Isaacs v. Head, 300 F.3d 1232, 1267-72 (11th Cir. 2002). Quite simply, Jones has not shown that the Georgia Supreme Court unreasonably applied Griffin or any other Supreme Court precedent in concluding that the prosecutor's argument did not violate Jones's Fifth Amendment privilege against self-incrimination.

Accordingly, we affirm the district court's denial of Jones's § 2254 petition.

**AFFIRMED.**